815 P.2d 1083

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Wess Allen KNAPP, Defendant–Appellant.**

No. 18824.

Court of Appeals of Idaho.

July 29, 1991.

Gregory A. Jones, Kootenai County Public Defender and Johnathan B. Hull, Deputy Public Defender, Coeur d'Alene for defendants-appellants.

Larry J. Echohawk, Atty. Gen. and Bernard W. McHugh, Deputy Atty. Gen., for plaintiff-respondent.

SWANSTROM, Judge.

Wess Knapp was arrested at the police station in Coeur d'Alene, Idaho, after he confessed to committing arson and burglary. Knapp entered a conditional guilty plea to two counts of first degree burglary, I.C. §§ 18–1401, –1402, –1403, –1404, four counts of first degree arson, I.C. § 18–801, five counts of second degree arson, I.C. § 18–802, one count of third degree arson, I.C. § 18–803, and one count of fourth degree arson, I.C. § 18–804, reserving the right to appeal from the denial of his suppression motions. I.C.R. 11(a)(2). On appeal, we must decide whether the district court correctly held that Knapp was not under arrest when police officers stopped, searched and questioned him on a city street in Coeur d'Alene. We also must decide whether a police officer had authority to enter Knapp's motel room to search for incriminating evidence. If the officer's presence in the motel room was lawful, we must then decide whether the officer illegally seized Knapp's tennis shoes. Finally, we must decide whether the delay in bringing Knapp before a magistrate for an initial appearance was an unreasonable delay. I.C. § 19–615; I.C.R. 5. For reasons explained below, we affirm the judgments of conviction.

The factual findings made by the district court are based on the following evidence presented at the hearing on the motion to suppress. Shortly before 7:00 a.m. on December 7, 1989, Coeur d'Alene police authorities were in foot pursuit of an arson suspect in the area of 16th and Penn in downtown Coeur d'Alene. Officer Blanchette of the Coeur d'Alene police department stopped at 15th and Sherman to meet with Officer Surplus who was conducting a stake-out of the Star Motel in downtown

Coeur d'Alene where Knapp was reportedly registered. The motel was about seven blocks away from where the foot pursuit was taking place. When Blanchette arrived at the motel, Surplus requested that he check police records in Coeur d'Alene and Post Falls for information on an arson suspect named Wess Knapp and then report back to him. Shortly thereafter, Blanchette returned to the motel with the requested information.

Surplus then asked Blanchette to brief the foot patrols on the information he had received on Knapp. At the time, Blanchette was dressed in street clothes and was driving his private vehicle. When Blanchette pulled out of the motel onto Sherman, he spotted an individual who met the description of the arson suspect walking through a parking lot on 15th and Sherman. Blanchette pulled over to the curb and blocked the driveway into the parking lot with his vehicle. Blanchette exited his vehicle, informed the suspect that he was a police officer, and asked him to stop and submit to a pat-down search for weapons. Surplus was watching the incident from about a block away.

When Blanchette frisked the suspect's outer clothing, he asked the individual his name. The man replied, "Wess Knapp." Blanchette then asked Knapp if he had any identification on him. Knapp said that he had an Idaho driver's license but that it was not on him. At that point, Blanchette removed from Knapp's clothing two padlocks, a lighter and a small tobacco pipe. None of these items were returned to Knapp. Blanchette then asked Knapp where he lived and Knapp replied, "Star Motel." Knapp explained that he was just returning to the motel from the grocery store a block up the street. Blanchette asked Knapp how long it had been since he had left his motel and Knapp said, "ten minutes." From this statement, Blanchette had reason to believe that Knapp was not telling him the truth, because Surplus had been watching Knapp's motel room for an hour. Blanchette then radioed Surplus to join him.

When Surplus arrived on the scene, he too was dressed in street clothes and was driving his private vehicle. Blanchette introduced Surplus to Knapp and told him that Surplus was a police officer. Minutes later, a couple of patrol cars pulled up to assist. No emergency equipment was activated and no weapons were displayed. The uniformed officers just stood nearby watching Surplus converse with Knapp. Meanwhile, Blanchette left to move his vehicle which was blocking the driveway of the parking lot. Several minutes later, Blanchette returned and stood in the background and listened to the end of the discussion between Surplus and Knapp. At the conclusion of the conversation, Surplus asked Knapp if he would come down to the police station and talk to him. Knapp said, "sure." Knapp also agreed to accept a ride down to the police station.

Surplus then called for a transport vehicle. Minutes later, Officer Atkins arrived in a patrol car. Knapp walked across the street to meet him. When Atkins began taking out his handcuffs, Blanchette turned to Surplus and asked if Knapp was under arrest. Surplus said no and walked across the street to tell this to Atkins. Knapp was then placed without handcuffs in the back seat of the patrol car and transported to the police station.

Once at the police station, Knapp followed Surplus to an interview room where he signed a written form acknowledging that he had received *Miranda* warnings and that he understood his rights. Surplus told Knapp that he was a suspect in an arson investigation and that he would like to get permission to search Knapp's motel room. Knapp denied any involvement in the arson, but he did agree to sign a consent to search form authorizing Surplus to search his motel room. Surplus then drove Knapp, in his private vehicle, to the Star Motel where they met Officer Greensides and Fireman Lopfer.

When Surplus and Knapp arrived at the motel, Knapp used his key to open the door of the motel room to let Surplus, Greensides and Lopfer inside. Shortly thereafter, Officer Moser arrived at the motel

and began assisting in the search. Knapp did not object to the officer's presence in the motel room. About one-half hour later, Surplus left the motel room, after Knapp promised to contact him at 1:30 p.m. on that same day. Greensides and Moser continued to search. Moser recognized several items in the room which appeared to have been stolen from two local businesses in Coeur d'Alene. Knapp was sitting on the bed in the motel with the soles of his shoes showing. Moser recognized that the tread pattern on Knapp's shoes was similar to a sketch of a tread pattern he had seen from recent burglaries. Moser requested the shoes, informing Knapp that a tread pattern on shoes could be matched up like fingerprints.

When Knapp removed his shoes, he made an incriminating statement about the burglary to Moser. Following this admission, Moser asked Knapp if he could meet with him to talk about the burglary. Knapp told Moser that he could speak with him later in the afternoon. Moser stated that he would prefer to talk to him sooner and that he had time right then. Knapp agreed to talk with Moser, and he accepted a ride to the police station in Moser's private vehicle.

Upon arrival at the police station, Knapp accompanied Moser to an interview room where he was given *Miranda* warnings and informed that the interview would be recorded. In the interview room, Knapp made incriminating statements about the burglary. Shortly thereafter, Knapp confessed to arson and was "formally" placed under arrest. Then, Knapp agreed to take Moser to several different fire sites in Coeur d'Alene after which he was taken to Kootenai County Public Safety Building for booking at about 3:30 p.m. on that same day.

Sometime after 8:00 a.m. the following morning, two police detectives met with Knapp for an interview. Knapp was again given *Miranda* warnings. He then made further incriminating statements about his involvement in the fires. Afterwards, Knapp agreed to view the fire sites with the detectives. Knapp was finally taken before a magistrate at 3:00 p.m. on that same day.

■ Preliminarily, we note our standard of review. When a violation of a constitutional right is challenged through a motion to suppress, as it is here, the proper appellate response is one of deference to factual findings unless they are clearly erroneous. However, we exercise free review over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found. *State v. Weber*, 116 Idaho 449, 776 P.2d 458 (1989).

■ We now turn to the substantive issues raised on appeal. Knapp argues that the detention on a city street in Coeur d'Alene ripened into an "illegal arrest," because no reasonable person would have believed that he was free to leave when police stopped, searched, and questioned him. Knapp contends that the inculpatory statements he made, and all of the physical evidence seized by the police after the initial street encounter, should be suppressed, because the illegal arrest tainted his "consent to search."

■ There are three categories of encounters between citizens and the police: (1) a full-scale arrest of the person, which the fourth amendment requires to be based on probable cause; (2) *Terry* stops, which require reasonable suspicion of criminal activity to qualify as a judicially created exception to the fourth amendment; and (3) voluntary consensual encounters, which fall outside the ambit of the fourth amendment. *State v. Zapp*, 108 Idaho 723, 701 P.2d 671 (Ct.App.1985).

We need not dwell on the least intrusive of the three categories, that is, consensual encounters, except to note that the landmark case in this area has been *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), where the Court considered the applicability of the fourth amendment to police inquiries at airports, based on the so-called "drug courier profile." Most recently, the Court adapted the *Mendenhall* standard so that it can be used to determine whether police practices of boarding stopped buses to

question passengers and to request permission to search luggage are truly "consensual encounters," not coming within the scope of the fourth amendment. *See Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

The line between a consensual encounter and a constitutionally permissible "seizure of the person" was set forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* the officer approached three men standing on a corner whom he suspected of "casing" the place, asked for their names, and, upon receiving a mumbled response, spun Terry around and frisked him. The Supreme Court held that a police officer may stop and pat-down an individual suspected of criminal activity without infringing upon his or her fourth amendment rights.

Subsequent Supreme Court decisions have emphasized that a *Terry* stop must be based on specific and articulable facts that justify suspicion of criminal activity. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In addition, the detention must be brief and last no longer than is necessary to effectuate the officer's purpose for the stop. *Florida v. Royer, supra.* *Terry* and progeny then created a "limited exception to the general rule that seizures of the person require probable cause to arrest." *Id.,* 460 U.S. at 499, 103 S.Ct. at 1325.

In the present case, the detention of Knapp at least falls within the definition of a *Terry* stop because Blanchette "seized" Knapp when he stopped him and patted him down for weapons. *Terry v. Ohio, supra; United States v. Mendenhall, supra.* Knapp admits, however, that the officer had reasonable and articulable suspicion to stop and briefly question him about his involvement in the fire, but he contends that the stop became illegal when it escalated into the most intrusive of the three categories: i.e., a full-blown arrest without probable cause.

The most prominent case on the issue of how long a *Terry* stop may continue without becoming an arrest is *Florida v. Royer, supra.* In *Royer,* the United States Supreme Court was again faced with an airport stop based on the so-called "drug courier profile." In distinguishing *Royer* from *Mendenhall,* the Supreme Court pointed to the following facts: Royer's ticket and identification remained in the possession of the detectives during the entire encounter. Royer's luggage was seized and held by the detectives. As a practical matter, Royer could not leave the airport without them. Furthermore, no attempt was made by the detectives to advise Royer that he was not required to consent to the search. The Supreme Court held that what started out to be a consensual encounter, and later a detention based on reasonable and articulable suspicion, ultimately escalated into Royer's illegal arrest.

There is no litmus paper test for determining when a *Terry* stop is converted to an arrest. *United States v. Jones,* 759 F.2d 633 (8th Cir.1985), *cert. denied,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). Factors such as the seriousness of the crime, the location of the encounter, the length of the detention, the reasonableness of the officer's display of force, and the conduct of the suspect as the encounter unfolds are all relevant in determining whether the line between a *Terry* stop and an arrest has been crossed. *Id.*

With this in mind, we now turn to the particular facts in the present case to determine whether the events that occurred subsequent to the stop converted Knapp's seizure into an arrest requiring probable cause. As previously mentioned, the encounter exceeded the limited intrusion allowed for consensual contacts between police and citizen under *Mendenhall* and *Bostick.* When Blanchette removed the pipe, lighter and two padlocks from Knapp's clothing, he also may have exceeded the scope of a search authorized by *Terry.* *See Terry v. Ohio, supra.* Blanchette did not testify that he removed these items because of concern for his safety. Accordingly, we are given no reason to assume that these items might be used as weapons. Despite the fact that the objects do not

appear to be inculpatory, the district court suppressed this evidence. *See, e.g., People v. Cobbin*, 692 P.2d 1069 (Colo.1984) (scope of a *Terry* stop exceeded when officers searched the suspect's pocket and confiscated contents).

The question of whether the illegal seizure of these objects also warranted suppression of Knapp's "consent to search the motel" has not been raised on appeal. Rather, Knapp asserts that his consent is tainted because it was preceded by an illegal arrest. Accordingly, our review is limited to determining whether the events leading up to Knapp's consent resulted in an illegal arrest. We hold that they did not.

The following factors explain why the stop did not escalate into a full-scale arrest: Blanchette was dressed in street clothes and was driving his own private vehicle when he asked Knapp to stop, identify himself, and submit to a pat-down search for weapons. The objects taken from Knapp were not incriminating evidence and did not impede his ability to walk away from the encounter. Surplus was also dressed in street clothes and was driving his own private vehicle. The questioning by the officers was brief and took place on a city street. The arrival of patrol cars did not escalate the encounter because no sirens were activated, no weapons were drawn and the uniformed officers did not question Knapp. Knapp voluntarily agreed to meet with Surplus at the police station and to accept a ride in the patrol car. Knapp was not handcuffed at the scene of the stop or when he was transported to the police station. Finally, it is reasonable to assume that Knapp knew he was not under arrest, because he was standing next to Atkins when Atkins was advised of that fact.

In light of these circumstances, we hold that the stop did not escalate into a full-scale arrest. We emphasize that the line between a stop based on reasonable and articulable suspicion, the so-called *Terry* stop, and an arrest, which requires probable cause, is necessarily dependent upon the individual facts of each case.

■ Knapp next contends that the officer had no authority to search his motel room for incriminating evidence. Knapp seeks to suppress all evidence gathered by the police after the officer entered his motel room because his consent authorized only Officer Surplus to search. Knapp claims that without consent, specific to Moser, the state had the burden of justifying the officer's presence in the room.

■ It is well established in fourth amendment jurisprudence that a person may waive his or her constitutional rights by consenting to a search. *United States v. Griffin*, 530 F.2d 739 (7th Cir.1976). "The consent may be in the form of words, gesture, or conduct." *Id.* at 742. However, the consent must be voluntarily given and be based on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Zapp, supra.* The burden of proving that the consent was voluntarily given rests with the state. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *State v. Huskey*, 106 Idaho 91, 675 P.2d 351 (Ct.App. 1984).

Before we can decide whether the officers' entry into the motel room was consensual, the officers' actions must be evaluated in light of all of the circumstances which occurred prior to the search of Knapp's motel room. At the police station, Knapp agreed to sign a written form authorizing Surplus to search his motel room. The form was filled out by Surplus and signed by Knapp. The consent form permitted Surplus to search the entire motel room for evidence. There were no restrictions on the scope of the search.

When Surplus and Knapp arrived at the motel, they were met by Greensides and Lopfer. Surplus had asked both of these people to meet him at Knapp's motel room to aid in the search. However, neither of these two people were specifically authorized by the consent form to enter and search Knapp's motel room. Knapp let Surplus, Greensides and Lopfer into his motel room by unlocking the door with his key. Once inside, all three individuals be-

gan searching the room. Minutes later, Moser arrived to help in the search. Moser's name was also absent from the consent to search form. At the time, Knapp did not object to a search by any of these individuals.

We disagree with Knapp's contention that the officers' participation in the search was without consent. The district court's finding that Knapp consented to the officers' presence in the motel room is well supported by the record. Knapp was informed of his *Miranda* rights and the reason for the search before he signed the written consent to search form. Knapp was not threatened or promised anything in exchange for his consent. Instead, Knapp was told that he did not have to consent if he did not want to. Knapp then voluntarily signed the written consent to search form authorizing Surplus to search his motel room for incriminating evidence. These factors are indicative of Knapp's willingness to allow Surplus to search his motel room. *United States v. Smith*, 543 F.2d 1141 (5th Cir.1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977).

■ However, Greensides and Lopfer were authorized to enter Knapp's motel room, not because of the written consent to search form, but because consent was "implied" from Knapp's actions in opening the door with his key and allowing the men to enter the room. *United States v. Turbyfill*, 525 F.2d 57 (8th Cir.1975). A similar finding can be made with respect to Officer Moser. *United States v. Griffin, supra.* When Moser entered the motel room to participate in the search for evidence, Knapp did not object to his presence. *Id.* Therefore, we agree with the district court's ruling that Knapp impliedly authorized the officer to enter his motel room. We believe that this finding is reasonable in light of the events which unfolded after Surplus obtained Knapp's written consent to search the motel room.

■ We now turn to the seizure of the tennis shoes, which Knapp argues were illegally seized by Officer Moser. Knapp also argues that the seizure of the shoes was not justified under the plain view doctrine, as the incriminating nature of the shoes was not immediately apparent, as the officer contended. The district court, however, found that Knapp had voluntarily given the shoes to the officer and that no impermissible seizure had taken place. From the record before us, we conclude that the shoes were properly seized while in "plain view." We need not decide whether Knapp voluntarily gave his shoes to the officer.

■ The plain view doctrine allows police officers to seize incriminating evidence that can be openly observed by them while performing their official duties. *State v. Rusho*, 110 Idaho 556, 716 P.2d 1328 (Ct. App.1986). The doctrine requires that three elements be satisfied. First, the officer must see the evidence from a location where he has a right to be. Second, the evidence seized by the officer must be obviously connected with criminal activity. Finally, the officer must have had no previous knowledge that the items seized would be found at a particular location. *Id.*

The first requirement is clearly satisfied in this case. As we mentioned earlier, Moser had a right to be in Knapp's motel room when he discovered the tennis shoes. The second requirement has also been met. The officer was the investigating officer in charge of burglaries at the time of the incident. While inside the motel room, he found several items that matched the description of objects that had been stolen from two businesses in Coeur d'Alene. From the officer's location in the room, he was able to observe that the tread pattern on Knapp's shoes matched a sketch of a tread pattern he had seen from two recent burglaries. Thus, the incriminating nature of the evidence was immediately apparent to the officer. Finally, we note that the officer only fortuitously discovered the shoes while inside the motel room. The officer had no previous knowledge that Knapp was involved in the burglaries or that incriminating evidence would be found on Knapp's feet. Because the seizure satisfied all three requirements of the plain view doctrine, we hold that the seizure was

not unreasonable under the fourth amendment.

■ We now turn to Knapp's final argument on appeal. Knapp contends that law enforcement authorities violated I.C. § 19–615 and I.C.R. 5 by unreasonably delaying his appearance before a magistrate for the sole purpose of obtaining more incriminating evidence against him. Knapp claims that all incriminating evidence gathered by the police after Knapp's arrest, but before his initial appearance, should be suppressed because it was acquired as a result of that unreasonable delay.

Idaho Code § 19–615 requires that a person arrested without a warrant must be taken before a magistrate without unreasonable delay. I.C.R. 5 engrafts a twenty-four hour time limitation onto this requirement. Therefore, a delay will automatically become "unreasonable" if the defendant is brought before a magistrate for an initial appearance more than twenty-four hours after the person is arrested.

In this case, it appears that as many as twenty-seven hours may have elapsed between the time of Knapp's arrest at the police station and his first appearance before the magistrate. Consequently, by definition, the delay here was unreasonable. However, this does not end our inquiry. To obtain relief for unnecessary delay, Knapp had the burden of showing that he had been prejudiced. *State v. Fowler,* 106 Idaho 3, 674 P.2d 432 (Ct.App.1983). Knapp alleges that he was prejudiced because the unreasonable delay contributed to the acquisition of inculpatory evidence. *Id.* However, all of the inculpatory evidence secured by the police following Knapp's arrest was obtained within the twenty-four hours allowed by I.C.R. 5. We conclude that the police collected evidence within the confines of the rule. Accordingly, we hold that Knapp has not demonstrated prejudice and we uphold the district court's admission of such inculpatory evidence.

We conclude that the district court committed no reversible error in ruling on Knapp's motion to suppress. Therefore, we affirm the judgments of conviction.

WALTERS, C.J., and SILAK, J., concur.