964 P.2d 660

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Edward Giacinto BUTI, Defendant–Appellant.**

No. 23837.

Supreme Court of Idaho,
Boise, May 1998 Term.

Aug. 28, 1998.

Rehearing Denied Oct. 14, 1998.

Whittier & Souza, Cht., Pocatello, for appellant. Robert C. Naftz argued.

Alan G. Lance, Attorney General; Catherine O. Derden, Deputy Attorney General, Boise, for respondent. Catherine O. Derden argued.

TROUT, Chief Justice.

This is an appeal from the district court's denial of Edward Giacinto Buti's motion to suppress evidence.

## I.

### BACKGROUND

Late on the morning of November 7, 1996, a man (later identified as Buti) rang the doorbell at the Deeg home in rural Power County. Mrs. Deeg was the only person home at the time. Because she did not recognize the man and because she was not expecting anyone, Mrs. Deeg did not answer the door. From a window, she observed the man walking away from the house. Mrs. Deeg watched the man get into the front passenger seat of a large, older model, white car. She then went to the peephole in the door to get a better look. She watched the man who had been at the door rock back and forth ten to twelve times. The man then got out of the car and headed back toward the house while the car was driven away. Mrs.

Deeg observed the man walk around the house and appear to talk into a walkie-talkie or cellular telephone. The man then came up onto the deck of the house and looked through a sliding glass door which was locked. Mrs. Deeg lost sight of the man as he walked around the house. The man then entered the house by breaking into the garage and coming through the door leading from the garage into the house. Mrs. Deeg confronted the man who immediately left. Mrs. Deeg tried to call 911, but the telephone was dead. Later it was discovered that the telephone line had been cut. Mrs. Deeg then went to another room in the house to get a cellular telephone. As she was calling 911 to report the break-in, Mrs. Deeg saw the man go down the road toward Highway 37. The white car arrived and the man ran to it and got inside. The white car then headed south on Highway 37 toward Rockland.

Power County dispatch received Mrs. Deeg's call at 11:38 a.m. Two officers were sent to the house. The officers did not go immediately to the house, but proceeded past the Deeg home to try to intercept the white car. Failing to do so, they arrived at the Deeg home about 30 to 40 minutes after the call. Mrs. Deeg told the officers what had happened. She described the man as "good looking," possibly Hispanic, with his hair back, and wearing a blue sweatshirt with white lettering on it. She also described the car and stated that another man whom she could not describe was the driver.

At about 11:50 a.m., the Oneida County Sheriff's patrols were notified to be on the look out for two burglary suspects, one wearing a blue shirt, in a car headed south on Highway 37. Officer Neal of the Oneida County Sheriff's Office saw a car with Pennsylvania license plates containing two men, with the passenger wearing a blue shirt, heading south on Highway 38 just past the junction with Highway 37. Officer Neal followed the car for about a mile before pulling it over with his overhead lights. The stop occurred at 12:21 p.m. in an unpopulated

area about 67 miles south of the Deeg home. Neal approached the car and asked the driver, David Corner, to turn off the motor and give him the keys which Corner did. Neal then asked for identification from both occupants. Corner gave Neal a Michigan driver license while the passenger produced a Nevada identification card identifying him as Buti. Officer Neal told Buti and Corner to wait in the car. Officer Neal kept the keys and the identification and returned to his patrol car. During the stop, Officer Neal observed Buti take off the blue sweatshirt. Neal radioed in a description of the vehicle and its occupants which was relayed to the officers with Mrs. Deeg. Since the car and the passenger matched the descriptions given by Mrs. Deeg, the officers decided to take Mrs. Deeg and her husband [1] to the stop for a "show up" identification.

While waiting, Corner and Buti motioned to Neal who told them over a loudspeaker to stay in the car until other officers arrived. At about 12:40 p.m., another officer arrived. The Power County Sheriff and an additional deputy arrived at about 1:20 p.m. The Deegs and the two deputies with them arrived about 15 minutes later.[2] At that point, the officers approached the car and told Buti and Corner to get out. At least one officer had a rifle pointed in the general direction of Corner's car. After Corner and Buti got out of the car, Officer Jeffries, who had helped interview Mrs. Deeg, reached into the car and retrieved the blue sweatshirt. Jeffries had not obtained consent to search the car and did not have a warrant. Both Buti and Corner were then handcuffed and walked back toward the car in which the Deegs were riding. Jeffries stood next to Buti and Corner and held the sweatshirt in front of him. Buti and Corner were placed in a patrol car and told to look at the hillside. Officer Jeffries walked back to Mrs. Deeg who identified Buti as the man who had broken into her house and identified the sweatshirt as the one Buti was wearing at the time of the

---

1. Mr. Deeg had not seen the burglar and did not participate in the identification.

2. Although Buti contends the stop lasted 45 minutes to an hour, the police records show that it

was 1 hour and 15 minutes between the stop and when the Deegs arrived at the scene. We find this time difference to be of no consequence in deciding the case.

break-in. Finally, the officers had the Deegs drive past the white car and Mrs. Deeg identified it as the one in which she had seen Buti drive away.

The officers then formally arrested Buti and Corner and impounded the white car. An inventory search of the car was conducted prior to its being towed. Walkie-talkies and various tools that could be used for burglaries were found during the inventory search.

Buti was charged with burglary, I.C. § 18–1401, and possession of burglarious instruments, I.C. § 18–1406. Later a charge of being a persistent violator, I.C. § 19–2514, was added. Buti entered a plea of not guilty and filed a motion to suppress evidence along with a motion for change of venue and an objection to the State's motion for consolidation. After a hearing, the district court denied the motion for a change of venue and granted the State's motion to consolidate. The district court issued a memorandum decision and order denying Buti's motion to suppress evidence. Buti then submitted a plea agreement under I.C.R. 11 in which he agreed to plead guilty to the burglary charge while reserving his right to appeal the denial of his motion to suppress evidence. The district court accepted the plea agreement and sentenced Buti to ten years in prison with seven years fixed. Following sentencing, Buti filed a notice of appeal to this Court.

On appeal, Buti argues that police actions converted the investigatory stop into a de facto arrest which was not supported by probable cause. In addition, Buti argues that the "show up" identification was unnecessarily suggestive in violation of his due process rights. Finally, Buti claims the warrantless seizure of the sweatshirt was illegal under the United States and Idaho Constitutions.

## II.

### STANDARD OF REVIEW

■ In reviewing a motion to suppress evidence, the trial court's findings of fact are reviewed for clear error while the determination of whether the constitutional requirements have been met is reviewed de novo.

*State v. Weber,* 116 Idaho 449, 451–52, 776 P.2d 458, 460–61 (1989).

## III.

### STOP AND DETENTION

In analyzing whether an investigatory stop constitutes an illegal arrest, a court must consider (1) if the original stop was valid, (2) if the stop was valid, did the actions of the police convert the stop into an arrest, and (3) if the stop was converted into an arrest, did the police have probable cause at the time the stop was converted into an arrest. At oral argument, counsel for Buti admitted that the investigatory stop was valid, so we need consider only the last two questions.

■ Buti first argues that the stop became a de facto arrest because he was detained for 45 minutes to an hour. While a detention cannot extend indefinitely, there is no bright line rule to determine when an investigatory detention has become an arrest. Instead, "common sense and ordinary human experience must govern over rigid criteria." *State v. Pannell,* 127 Idaho 420, 423, 901 P.2d 1321, 1324 (1995) (quoting *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)). Buti claims that the stop became an arrest because the police did not use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Pannell,* 127 Idaho at 423, 901 P.2d at 1324 (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983)). Buti argues that the deputy who made the original stop could have simply questioned Buti and Corner rather than detaining them until Mrs. Deeg arrived.

■ The test under *Royer,* however, is not that police use the least intrusive means, but that they use the least intrusive means reasonably available. This requires that the appellate court look at the surrounding circumstances. The standard, as stated by the United States Supreme Court in *Sharpe,* is as follows:

In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to

examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Sharpe*, 470 U.S. at 686–87, 105 S.Ct. at 1575–76 (quotes and citations omitted).

In the present case, Buti was stopped in a car and so had a means to leave the area quickly. The car had out-of-state license plates and the identification produced showed that both Buti and Corner were from out-of-state. The officer was by himself in an isolated area. As soon as the officers with Mrs. Deeg learned of the stop, they immediately left in order to conduct the identification. The investigatory method employed, a "show up" identification, could have quickly and conclusively established Buti's innocence. Given the circumstances, the police acted diligently and reasonably to confirm or dispel their suspicions. Thus, the fact that the detention lasted approximately an hour did not convert the stop into an arrest. *See United States v. Richards*, 500 F.2d 1025 (9th Cir.1974) (detention of occupants of a private plane for over an hour not an arrest where police diligently pursued means to clarify the situation and suspects could have easily escaped in the plane).

■ Buti also argues, and the district court agreed, that his removal from the car at gun point along with the use of handcuffs converted the stop into an arrest. In reaching its decision, the district court relied on this Court's holding in *State v. Pannell*, 127 Idaho 420, 901 P.2d 1321 (1995). In *Pannell*, police stopped the defendant who was suspected of being involved in a domestic disturbance. Upon questioning Pannell, the officers determined that he was too intoxicated to safely drive. They therefore handcuffed him and placed him in the back of the patrol car to transport him back to his house. In overturning the district court's denial of Pannell's motion to suppress, this Court held that handcuffing Pannell and placing him in the patrol car converted the investigatory detention into an arrest. If anything, the facts in this case suggest that the need for handcuffs was considerably less than in *Pannell*. The record reflects that at least six officers were on the scene. Buti and Corner had at all times complied with the requests of the officers and there was no indication that either man was armed. Given the holding in *Pannell*, the district court did not err in holding the presence of the rifle and the use of the handcuffs converted the stop into an arrest.

In arguing that the use of handcuffs did not turn the stop into an arrest, the State cites *State v. Johns*, 112 Idaho 873, 736 P.2d 1327 (1987). *Johns*, however, is factually distinguishable from the present case. In *Johns*, a lone officer stopped a suspected murderer who had used a knife to kill his victim. In frisking Johns, the officer discovered a knife. In addition, during the stop Johns acted nervous and offered some slight resistance to the search. The officer also testified that he was apprehensive about his own safety. As noted above, in the present case there were six officers present and there had been no indication of violence or that the suspects had weapons. In addition, none of the officers testified that they were apprehensive about their safety. It is also not possible to justify the use of handcuffs to protect the witness. At the time of the identification, Mrs. Deeg was in a car and the suspects were at least 25 feet away. We therefore conclude that the removal of Buti from the car at gun point and placing him in handcuffs converted the investigatory stop

into an arrest. *See also State v. Duvalt,* 131 Idaho 550, 961 P.2d 641 (1998).

■ Having concluded that Buti was arrested, we must now consider whether probable cause existed at the time of the arrest.

Reasonable or probable cause for an arrest exists where the officer possesses information that would lead a person of ordinary care and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty. In evaluating a police officer's determination of probable cause in the field, a court must take into account the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act. In determining whether there is probable cause for an arrest, an officer is entitled to draw reasonable inferences from the available information in light of the knowledge that he has gained from his previous experience and training.

*State v. Kysar,* 116 Idaho 992, 993, 783 P.2d 859, 860 (1989) (quotes and citations omitted).

In reaching its decision, the district court held that probable cause for an arrest existed at the time of the investigatory stop. Because we conclude that Buti was not arrested until he was removed from the car, we need only consider if probable cause to arrest existed at that time.

At the time Buti was arrested, not only was the officer who made the stop present, but also the two officers who had interviewed Mrs. Deeg. These officers had exchanged information prior to ordering Buti and Corner out of the car. Thus, at the time of the arrest, the officers on the scene had information that the stop occurred at a location consistent with the direction Mrs. Deeg had said the car was traveling and at a distance from the Deeg house consistent with the time between the break-in and the stop. The car matched the description given by Mrs. Deeg. The location of the stop was isolated with little traffic so it was unlikely that a large number of vehicles matching the description would be present. The car contained two occupants which was consistent with Mrs. Deeg's report and the passenger matched the description of the burglar given by Mrs. Deeg. Finally, the car contained a sweatshirt that matched the description of the sweatshirt that Mrs. Deeg reported had been worn by the burglar and the passenger had been observed removing the sweatshirt after the car had been stopped. Taken together, these facts would lead a prudent person to entertain a strong suspicion that the occupants of the car had been involved in the burglary and so establish probable cause to arrest. We therefore find no error in the district court's ruling that the evidence should not be suppressed as the fruit of an illegal arrest.

**IV.**

**IDENTIFICATION**

■ Buti next argues that even if the arrest was legal, the district court should have suppressed the pre-trial identification because it was unnecessarily suggestive in violation of the Due Process Clause and Article I, Section 13 of the Idaho Constitution. Buti claims that the identification was unnecessarily suggestive because, at the time of the identification, he was in handcuffs. In support of this argument, Buti cites this Court's opinion in *State v. Kysar,* 116 Idaho 992, 783 P.2d 859 (1989). Buti argues that the fact that the defendants in *Kysar* were not handcuffed was "critical" to this Court's decision that the identification was not overly suggestive. Buti overstates our holding in *Kysar.* Although the Court in *Kysar* considered the lack of handcuffs as a factor in determining whether the identification was suggestive, there is nothing in the opinion to suggest it was critical. *See also State v. Best,* 117 Idaho 652, 791 P.2d 33 (Ct.App. 1990) (identification not impermissibly suggestive even though defendant alone and handcuffed in a police car); *United States v. Kessler,* 692 F.2d 584 (9th Cir.1982) (use of handcuffs will not necessarily invalidate identification). Instead, the opinion places considerable emphasis on the reliability of the identification, noting that "reliability is the linchpin in determining the admissibility of identification testimony." *Kysar,* 116 Idaho at 995, 783 P.2d at 862 (quoting *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). In *Kysar,* this Court

set forth the factors to be used in determining the reliability of identifications. These factors include:

(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification.

*Kysar,* 116 Idaho at 995, 783 P.2d at 862 (citations omitted).

In applying the above factors to the present case, we agree with the district court that the identification was reliable and so did not violate due process. Mrs. Deeg had numerous opportunities to view Buti, in several instances at close range, at the time of the crime. Her observation of Buti was not casual, but at a time when Mrs. Deeg rightly assumed that Buti was trying to break into her home. Buti presents no evidence that Mrs. Deeg's description was in any way inaccurate. The officer with Mrs. Deeg testified that her identification was not tentative, but a positive identification. Finally, the identification was made within two hours of the crime when Mrs. Deeg's memory of the burglar would still be fresh. Yet another indication of reliability was Mrs. Deeg's refusal to identify Corner because she had not gotten a good look at the driver of the car.

Buti argues that the identification was unreliable because Mrs. Deeg gave only a limited description of Buti. The test, however, is not the extent of the description given by the witness, but the accuracy of the description. Buti points to no instance where Mrs. Deeg's description of him was inaccurate. The fact that Mrs. Deeg's description was not as extensive as it could have been did not make her subsequent identification inherently unreliable.

In addition, we note that Buti was not alone at the time of the identification, but was standing next to Corner who was also handcuffed. We find nothing in the record, and counsel for Buti could point to nothing in the record at oral argument, to indicate that Corner and Buti were so dissimilar in appearance that there could be no possibility of confusing one for the other. At the suppression hearing, Officer Jeffries testified that he showed both men to Mrs. Deeg, because based on their appearance, he was not sure which one was the man Mrs. Deeg had seen in her home.

Buti also argues that the identification was unreliable because of the presence of the sweatshirt. At the time of the identification, the sweatshirt was not being held in front of either of the two suspects, but was being held in front of a deputy. The deputy present also testified that Mrs. Deeg identified the sweatshirt independent of the suspects. Finally, it must be noted that Buti was observed to remove the sweatshirt after being stopped in what can only be characterized as an attempt to change his appearance. Therefore, at best, the presence of the sweatshirt only returned the situation to how it existed at the time the car was stopped. We therefore agree with the district court that the identification was not so suggestive as to violate due process.

## V.

### SEIZURE OF THE SWEATSHIRT

■ Finally, Buti argues that the sweatshirt should have been suppressed because it was illegally seized. Buti further argues that the identification must be suppressed because it was a fruit of the illegally seized sweatshirt. The district court upheld the seizure of the sweatshirt under the plain view and automobile exceptions to the warrant requirement.

■ In upholding the seizure under the plain view exception, the district court held that the officer had observed the sweatshirt from a location where he had a right to be and that it was immediately apparent that the sweatshirt was evidence as required by *State v. Hagedorn,* 129 Idaho 155, 922 P.2d 1081 (Ct.App.1996). The test as stated in *Hagedorn,* however, is incomplete. In addition to the two requirements already stated, application of the plain view exception also requires that the officer have "a lawful right of access to the object itself." *Horton v. California,* 496 U.S. 128, 137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). In this case,

Officer Jeffries did not have legal access to the interior of the car because at the time Officer Jeffries seized the sweatshirt, he did not consider either Buti or Corner to be under arrest.

The seizure can, however, be upheld under the automobile exception. The automobile exception allows police officers to conduct warrantless searches of automobiles if they have probable cause to believe that the automobile contains contraband or evidence of a crime. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *State v. Gallegos,* 120 Idaho 894, 821 P.2d 949 (1991). At the time Officer Jeffries saw the sweatshirt in the car and seized it, he had heard Mrs. Deeg describe the sweatshirt the burglar was wearing and had been told that the passenger had removed a blue sweatshirt after being stopped. Considering these circumstances, Officer Jeffries had probable cause to believe that the sweatshirt he saw in the car was evidence of a crime and so its warrantless seizure was legal under the automobile exception to the warrant requirement.

## VI.

### CONCLUSION

For the reasons stated above, the district court's denial of Buti's motion to suppress evidence is hereby affirmed.

JOHNSON, SILAK, SCHROEDER and WALTERS, JJ., concur.