986 P.2d 1030

**STATE of Idaho, Plaintiff–Respondent,**

v.

**David L. FRANK, Defendant–Appellant.**

No. 24572.

Court of Appeals of Idaho.

July 20, 1999.

John M. Adams, Kootenai County Public Defender; J. Bradford Chapman, Deputy Public Defender, Coeur d'Alene, for appellant. J. Bradford Chapman, argued.

Hon. Alan G. Lance, Attorney General; Rebekah A. Cude, Deputy Attorney General, Boise, for respondent. Rebekah A. Cude, argued.

SCHWARTZMAN, Judge.

Pursuant to an Idaho Criminal Rule 11 plea agreement, David Frank pled guilty to felony possession of a controlled substance, I.C. § 37–2732(c), but reserved his right to appeal the denial of his motion to suppress evidence. Frank now appeals, asserting that the district court erred in holding that certain physical evidence and Frank's statements made at the scene of his arrest were admissible. We affirm in part and reverse in part.

## I.

### FACTS AND PROCEDURE

On July 1, 1997, at approximately 10:10 p.m., the Kootenai County Sheriff's Department received an anonymous complaint from a caller who either heard or saw three men and heard loud noises which the caller felt may have been suspicious at that hour of the evening. The caller identified the men's location as the northwest portion of Dalton Mini Storage. Having been dispatched to investigate the complaint, Officer Miller arrived at the storage facility and parked near the entrance. The lighting at the facility was dim, with a light approximately every one-hundred yards. Miller exited his vehicle and walked to the northwest side of one of three storage buildings to check for "anything suspicious."

Miller observed two open storage units, one with a light on and a truck parked in front of it, the other located approximately fifty yards north of the first. The officer watched as a man, later identified as David Frank, closed the door of the northern-most unit. Frank was kneeling down, but then stood and turned toward Officer Miller. The officer noted that Frank was holding items in his hands and looking at him. Officer Miller then identified himself as being with the Sheriff's Department and requested that Frank "step over here." Frank verbally agreed to do so, but instead,

> he stood and he kinda jogged back and forth and he turned away from me and he bent over. And at that point I demanded basically that he turn around and show me his hands.... [H]e started walking. He took about two steps, two very small steps forward uh, said "All right, all right," and he dropped something on the ground. Then he turned back around and he was standing there facing me.

Although the officer could see the general shape of the item dropped by Frank, he could not identify it. Frank was also holding clothing, a vacuum attachment and a mini-flashlight, all of which were taken from what Frank claimed was an abandoned storage unit. Miller told Frank to put the items

down. Frank complied, and the officer proceeded to place him up against a wall and effectuate a pat-down search of the exterior of his clothing to ensure that he was not armed. Finding no weapons, Officer Miller informed Frank of the suspicious noises and explained that Frank would be "detained" until the area could be secured. As a result, Frank was handcuffed and placed in the back of Miller's patrol car.

Officer Miller and another officer who had arrived for backup searched the facility and secured the area. Officer Miller inspected the item dropped by Frank, later identified as a water balloon, and opened the storage unit door that Frank had been closing when Officer Miller first encountered him. During this search the officers did not find anyone else at the facility. The officer picked up the water balloon and carried it with him as he returned to the patrol car. He asked Frank to exit the vehicle, and Frank complied with the request. At that time, the officer noticed another object, similar to the dropped water balloon, lying in the rear of the patrol car.

While Frank was standing outside of the car, the officer proceeded to question him about his possession of the balloons and the reason for his presence at the storage facility. Realizing that during the initial pat-down search of Frank he had not found the second, rather large water balloon, Officer Miller subjected Frank to a second search for weapons. During this search, he determined that a small, hard object which had been in Frank's right front pocket during the first search was no longer there. Accordingly, the officer had Frank step aside while he searched the rear seat of the patrol car. During this search, the officer discovered a small metal cylinder with a screw-top cap which was similar in size and shape to the object he had previously felt in Frank's pocket. Without removing the handcuffs or reading him his *Miranda*[1] rights, the officer questioned Frank about the cylindrical object.

> [I] just asked him, I said uh, you know, 'Why are you dropping things in my car?' and he said, 'I didn't.' He denied any

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

knowledge of it at first. And then I advised him that I check my patrol unit before and after every shift um, after everybody gets in and out of my car that the back seat is checked thoroughly. Um, and uh, due to the fact that he dropped the first object in my car I was just, you know—I asked him, I said, 'Well, you know, did you drop this, too' and he said, 'Yeah.' And I said, 'Well, uh, if I open this,' I said, 'is it gonna explode, is it gonna hurt me in any way?' And he said, 'No.' ... He advised me, he shook his head and he said, 'It's just that crystal stuff.' And I said, 'Crystal what?' and he said, 'That crystal meth stuff.'

Miller then opened the cylinder and found what he believed to be methamphetamine.

Frank was charged with felony possession of a controlled substance, I.C. § 37-2732(c). He pled not guilty and filed a motion to suppress all evidence "obtained after his illegal detention and search." Following a hearing, the district court held that the *Terry*[2] stop did not become an illegal arrest. The court further found that the cylinder had been abandoned and was not discovered as the result of a search of Frank. Finally, the court held that, "[i]t may be that there was an in-custody situation of sort, but I don't find there was any interrogation." Accordingly, the district court denied Frank's motion to suppress.

Frank entered a conditional guilty plea pursuant to an Idaho Criminal Rule 11 plea agreement, and reserved his right to appeal the district court's denial of his motion to suppress. The court sentenced Frank to a suspended three-year sentence and placed him on probation. Frank now appeals the district court's denial of his motion to suppress.

## II.

### STANDARD OF REVIEW

[1–3] When reviewing an order denying a motion to suppress, this Court defers to the findings of fact of the trial court unless they are clearly erroneous. *State v. DuValt*, 131

Idaho 550, 552–53, 961 P.2d 641, 643–44 (1998), *citing State v. Medley*, 127 Idaho 182, 185, 898 P.2d 1093, 1096 (1995). We also exercise free review over whether, in light of the facts found, constitutional requirements have been satisfied. *Id.* Finally, we give due deference to any implicit findings of the trial court supported by substantial evidence. *Id.*, *citing State v. Kirkwood*, 111 Idaho 623, 625, 726 P.2d 735, 737 (1986).

## III.

### ANALYSIS

**A. Frank Conceded The Legality Of The Initial Stop And Frisk**

In his brief on appeal, Frank asserts that the original stop was unreasonable and, therefore, violative of his rights under the Fourth Amendment and Article I, § 17 of the Idaho Constitution. He further claims that because the initial stop and frisk were unconstitutional, all evidence obtained as a result of this stop should be suppressed. However, during the suppression hearing, defense counsel stated that, "for purposes of this argument I'll concede there was the right to pat him, no weapons were found." At oral argument, defense counsel further conceded that the officer had sufficient knowledge to justify *both* the initial *Terry* stop and the subsequent pat down search of Frank. Accordingly, we decline to address these issues as argued in the briefs.

**B. Frank Was Not Subjected To A *De Facto* Arrest For Fourth Amendment Purposes**

Frank asserts that he was subjected to a *de facto* arrest, which was illegal in the absence of probable cause. This *de facto* arrest was purportedly the result of the officer's use of an unreasonable level of detention during the investigatory stop. Specifically, Frank asserts that the officer's actions of handcuffing him and placing him in the back of a patrol car exceeded the reasonable bounds of a *Terry* stop.

"[T]here is no bright line rule to determine when an investigatory detention has

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20    L.Ed.2d 889 (1968).

become an arrest. Instead, 'common sense and ordinary human experience must govern over rigid criteria.'" *State v. Buti*, 131 Idaho 793, 796, 964 P.2d 660, 663 (1998), *citing State v. Pannell, infra.* As such, this Court must consider all of the surrounding circumstances and determine whether the investigative methods employed were the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id., citing Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983).

> [B]ased upon the specific facts of the situation and the reasonable inferences drawn from those facts, officers are entitled to use handcuffs in limited investigatory stops to maintain their safety. [*State v. Johns*, 112 Idaho 873, 877–78, 736 P.2d 1327, 1331–32 (1987)]. If the use of the handcuffs is a reasonable precaution to ensure the officers' safety, the use of the handcuffs is warranted during the limited stop. If the investigative detention becomes unreasonable, the detention is transformed into an arrest. *State v. Pannell*, 127 Idaho 420, 423, 901 P.2d 1321, 1324 (1995). In determining if the detention becomes unreasonable, the court is to consider: (1) the duration of the invasion imposed by the additional restriction; and (2) the law enforcement purposes served. *Id.*

*State v. DuValt*, 131 Idaho 550, 554, 961 P.2d 641, 645 (1998). Additional "[f]actors to be considered in distinguishing an investigative stop from a *de facto* arrest include the seriousness of the crime, the location of the encounter, the length of the detention, the reasonableness of the officer's display of force, and the conduct of the suspect as the encounter unfolds." *State v. Martinez*, 129 Idaho 426, 431, 925 P.2d 1125, 1130 (Ct.App. 1996), *citing State v. Knapp*, 120 Idaho 343, 347, 815 P.2d 1083, 1087 (Ct.App.1991).

■ In light of all the surrounding circumstances, we find that when Officer Miller handcuffed Frank and placed him in the back of the patrol car he did not exceed the reasonable bounds of a *Terry* stop. Officer Miller had been dispatched to investigate a report of three men and suspicious noises at a storage facility at about 10:10 p.m. When he arrived it was already dark and the facility was dimly lit. Essentially, Officer Miller was alone and faced with a potentially dangerous situation in an unfamiliar and darkened area in which two other as yet unidentified persons might be lurking or otherwise engaged in criminal activity.

Frank's conduct during the encounter further justified the officer's decision to briefly but significantly restrain his freedom of movement until the danger was reasonably dispelled. Previously, Idaho courts have considered the level of cooperativeness shown by a suspect in determining whether the use of handcuffs was justified during an investigative stop. *See DuValt*, 131 Idaho at 554, 961 P.2d at 645 (finding use of handcuffs during investigatory stop appropriate where suspects' apparent attempt to elude officers and lack of cooperation once stopped justified belief that they posed a danger to officer safety); *compare State v. Pannell*, 127 Idaho 420, 424, 901 P.2d 1321, 1325 (1995) (holding use of handcuffs exceeded the reasonable bounds of a *Terry* stop when suspect had been "fully compliant"); *Buti*, 131 Idaho at 797, 964 P.2d at 664 (holding use of handcuffs partially responsible for converting valid *Terry* stop of over one hour, in which defendant was restricted to car, into an arrest when suspects were then removed from car at gunpoint and placed in handcuffs). Here, Frank's initial conduct and reactions served to place the officer on heightened alert rather than dispel concern for his own safety.

Based upon a possible burglary in progress, Frank's behavior and the potential of other, unaccounted for suspects in a dimly lit and unfamiliar location, we find that Officer Miller was justified in his belief that his safety was in danger. Accordingly, the officer exercised a reasonable level of restraint in dealing with that threat when he handcuffed Frank and placed him in the rear of the patrol car for the brief period of time during which he searched and secured the surrounding area.[3] Furthermore, when Offi-

---

**3.** "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic sec-

cer Miller sought to release Frank, he found a relatively large item in the back of the patrol car. This unexpected turn of events made it reasonable for Miller to leave Frank in handcuffs while a second pat-down search was conducted and any threat to officer safety was dispelled. Similarly, as the situation further unfolded and Miller determined that an item was missing from Frank's pocket, the officer was justified in ascertaining where that item was before releasing Frank.

Accordingly, we hold that handcuffing Frank and placing him in the back of the police car was a reasonable means to protect the safety of this officer and did not otherwise convert a valid *Terry* stop into an illegal arrest.

## C. Although Not Under Arrest, Frank Was in Custody For Purposes Of *Miranda* And Was Subjected To Interrogation

The district court rejected Frank's claim that his statements should be suppressed because Officer Miller failed to give *Miranda* warnings prior to questioning him about the metal cylinder. In doing so, the court stated that although there may have been "an in-custody situation," there was no interrogation.

The determination of whether a person is in custody for *Miranda* purposes is a mixed question of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Accordingly, this Court applies a bifurcated analysis under which findings of fact supported by substantial evidence are not disturbed, but we independently determine whether the constitutional requirements are satisfied in light of the facts found. *State v. Doe*, 130 Idaho 811, 814, 948 P.2d 166, 169 (Ct.App.1997).

The district court correctly found that when Officer Miller questioned Frank about the metal cylinder, Frank was in custody for purposes of *Miranda*. A person need not be under arrest to be "in custody" for *Miranda* purposes. *See Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 335 (rejecting a bright line rule which would require *Miranda* warnings only when a defendant was formally placed under arrest because it would "enable the police to circumvent the constraints on custodial interrogations"); *State v. Myers*, 118 Idaho 608, 798 P.2d 453 (Ct.App.1990) (holding that a "non-routine" traffic stop, which involved four police vehicles and excessive police domination, resulted in a custodial situation for purposes of *Miranda* warnings). Short of an actual arrest, "the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 335, *quoting California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). "The 'custody' test is an objective one; it is not based upon the subjective impressions in the minds of either the defendant or the law enforcement officer." *State v. Massee*, 132 Idaho 163, 165, 968 P.2d 258, 260 (Ct.App.1998). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Id., quoting Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. *See also State v. Doe, supra* (fifth-grade student summoned and interviewed by school resource officer in faculty room of school was "in custody" for purposes of *Miranda*).

In the instant case, we find that at the time of the relevant questioning, a reasonable person would have understood his or her freedom of action to have been curtailed to a degree associated with formal arrest. Officer Miller had informed Frank that he would be released once the area was secured. However, after the officers had completed their inspection of the storage facility, Frank was merely removed from the patrol car. Due to the unexpected appearance of a water balloon, he was subjected to a second pat-down search, which again revealed no weapons. The officer then searched the back of the patrol car and, upon discovering a metal

ond-guessing." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 616 (1985).

cylinder, directly questioned Frank to determine if he was the owner and whether it was dangerous.[4] During the full course of this investigation, Frank remained in handcuffs and was basically restricted to the police vehicle. Although this continuous restraint did not amount to an actual arrest, Frank's freedom of action was curtailed to a degree *associated* with formal arrest. Accordingly, we find that Frank was *in custody* for purposes of *Miranda*.

Furthermore, we conclude that Frank was subjected to *interrogation*. In *Miranda* the United States Supreme Court very simply stated that "[b]y custodial interrogation, we mean questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The term interrogation was later refined in *Rhode Island v. Innis*, 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 307–09 (1980):

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke

an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable result of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

Applying this test to the facts of *Innis*, the Court noted that the "first prong of the definition of interrogation" was not satisfied because express questioning had not taken place. *Id.* at 302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308. After having ruled out express questioning, the court considered whether the police officers' dialogue was the "functional equivalent of questioning" by examining whether it was "reasonably likely to elicit an incriminating response." *Id.*

■ In the present case, Officer Miller directly questioned Frank about the ownership and contents of the metal cylinder, thus satisfying the first prong of the *Innis* test for interrogation.[5] Although we recognize that there are exceptions to the dictates of *Miranda* which allow the admission of unwarned statements made during custodial interrogation, they do not apply under the facts of this case. *See Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (holding that non-testimonial or physical responses to custodial interrogation are admissible and, with differing reasoning in a plurality opinion, holding that answers to booking questions are also admissible).[6] Because Frank was subjected to direct questioning requiring a testimonial response, in the absence of *Miranda* warnings his statements should have been suppressed.

### IV.

### CONCLUSION

We affirm the denial of Frank's motion to suppress the contraband evidence found in

---

4. The state has not attempted to justify this questioning under the "public-safety" exception elucidated in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

5. We also note this line of inquiry had nothing to do with and was unrelated to the justification for the original stop. *See Myers, supra*, 118 Idaho at 612, 798 P.2d at 457.

6. In order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a witness against himself. *Muniz*, 496 U.S. at 589, 110 S.Ct. at 2643, 110 L.Ed.2d at 544, *quoting Doe v. United States*, 487 U.S. 201, 210, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184, 197 (1988).

the police vehicle. While we find that the initial *Terry* stop was not converted into an arrest when Frank was handcuffed and detained in Officer Miller's patrol car, we also conclude that Frank was in custody for purposes of *Miranda* when he was interrogated by Officer Miller. Accordingly, we reverse the district court's denial of Frank's motion to suppress statements elicited during this interrogation, and remand this case to the district court for possible further proceedings consistent with this opinion and the original Rule 11 plea agreement.

Judge LANSING and Judge Pro Tem HARDING, concur.