972 P.2d 730

**Luis HERNANDEZ, Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 23459.

Court of Appeals of Idaho.

Dec. 15, 1998.

Review Denied March 12, 1999.

Wiebe & Fouser, Canyon County Public Defenders; Thomas A. Sullivan, Deputy Public Defender, Nampa, for appellant. Thomas A. Sullivan argued.

Hon. Alan G. Lance, Attorney General; Kenneth M. Robins, Deputy Attorney General, Boise, for respondent. Kenneth M. Robins argued.

SCHWARTZMAN, Judge.

Luis Hernandez appeals from the district court's order denying his petition for post-conviction relief. For the reasons stated below, we reverse and remand for proceedings consistent with this opinion.

# I.

## FACTUAL & PROCEDURAL BACKGROUND [1]

On July 30, 1993, Officer Damron was conducting routine patrol for the city of Caldwell. At approximately 12:42 a.m., Damron observed Jerry Taylor and Rocky Salas standing and talking in front of the Waldorf bar. Damron testified that the two were "looking around, acting suspicious. They looked nervous." He continued to watch them and "it appeared that they may have handed each other something." Damron then observed Salas walk back across the street and get into a vehicle occupied by two individuals, Frank Garcia and Luis Hernandez.

Damron recognized Taylor from a previous drug arrest and was aware that he was involved in a grand jury indictment for delivery of cocaine. Despite Damron's knowledge of Taylor's prior drug history, Damron did not follow Taylor but instead decided to follow the Garcia vehicle because he just felt that "maybe some type of a drug transaction occurred." When the vehicle stopped in front of a residence five blocks from the bar, Damron parked about seventy-five feet behind the vehicle and watched the three occupants. He observed what he believed to be the front-seat passenger reaching back to get something from Salas in the back seat, and then observed the front-seat passenger step out of the vehicle. At this point, Damron approached the vehicle and saw Hernandez, the front-seat passenger, walk toward the residence.

Damron identified himself as a police officer and told Hernandez to stop. Hernandez looked at Damron and then "hurried into the residence." Damron told him to stop again and tried to reach Hernandez before he entered the residence, without success. A woman at the front door stopped Damron from following Hernandez into the residence.

Damron told Hernandez that he wanted Hernandez back outside and that he needed to talk to him. Damron testified that from the doorway, he could see Hernandez going into what he believed to be the kitchen. Five to ten seconds later, Hernandez exited the residence and Damron told him to step over to his police car. Damron confirmed Hernandez's identity through a driver's license, patted him down for weapons and finding none, told him to sit down on the front steps of the residence. Damron testified that he "didn't see a crime at that time" and that he only "had suspicion that a crime—I needed to investigate further." Damron also testified that he "probably ran a driver's license check, which is standard procedure, on Mr. Hernandez...." [2] Thereafter, Damron "was curious to see what—what he [Hernandez] did not want me to have or see or whatever, what he put in the kitchen, so I walked over to the kitchen window and looked inside the kitchen."

In order to gain a view inside the kitchen, Officer Damron stood "[a] couple of feet off of the alleyway just on the—that would be the southeast corner of the residence." From this vantage point, Damron observed "four bags of a white powdery substance packaged in plastic on the kitchen table." As he was looking through the window, a woman inside the home closed the curtain so he could not see further inside.

Damron called the narcotics investigator "with the suspicious activity that I saw at the downtown bars, Luis Hernandez not stopping when I told him to stop, acting suspicious, going into the kitchen and then coming back out after ten seconds, seeing the white powdery substance packaged in the kitchen commonly the way drug dealers or sellers or—would package it, I felt that there might, you know, be sufficient evidence for a search warrant." While awaiting the issuance of a search warrant, Damron stood in the doorway of the residence, informing the individu-

---

1. Unless otherwise indicated, the facts are taken from Officer Damron's preliminary hearing and trial testimony, which differed somewhat from his much later post-conviction hearing testimony.

2. Initially, Frank Garcia and Rocky Salas, the occupants of the car who arrived with Hernan-

dez, were detained in their vehicle. Both Garcia and Salas stayed in the vehicle until an additional officer arrived, at which point they were detained on the front steps of the residence along with Hernandez.

als present that a warrant was en route and that they were not free to go into the kitchen or leave the residence.

By the time the search warrant arrived, Hernandez had been sitting on the front porch for approximately one hour. During this time and during the execution of the warrant, Damron testified at both the preliminary hearing and court trial that Hernandez twice asked to use the bathroom. The first time, Damron told him to "hold it." The second time Hernandez asked to use the bathroom, Damron testified that he asked the renter of the house if Hernandez could use the bathroom and she refused. However, at the post-conviction hearing, Damron testified that Hernandez only asked to use the bathroom once and was advised "that as soon as we finished the search, he would be allowed to use the restroom." Damron also testified that the officers could not allow Hernandez into the house to use the bathroom because it was a crime scene and they could not take him around the back of the house because they would be assisting him in the commission of the crime of urinating in public. Furthermore, Damron noted that Hernandez "was advised that he could hold it just as several officers were doing until we were done searching and he would be allowed to use the restroom." He also testified that Hernandez was not detained for a long time and that a normal adult could "hold it" under the circumstances.

Eventually Hernandez left the front steps to urinate in or by the alleyway, which act was observed by Damron.[3] Approximately forty-five minutes later, after the search of the residence revealed no contraband,[4] Damron arrested Hernandez for urinating in public. Hernandez was searched incident to his arrest, and officers found .068 grams of methamphetamine folded up in a dollar bill in his sock.

Hernandez was charged with the possession of a controlled substance, I.C. § 37–

2732(c)(1). A preliminary hearing was held on December 1, 1993, during which the court heard testimony from Officer Damron. When defense counsel attempted to question Damron about his observations of the individuals in front of the bar in downtown Caldwell and the time span between Hernandez's arrest and those observations, the magistrate stated: "I don't think what happened at the bar is relevant." The magistrate found probable cause to believe Hernandez was in possession of methamphetamine and bound him over for arraignment in the district court.

The prosecutor then filed a Part II Amended Information charging Hernandez with being a persistent violator. On February 28, 1994, defense counsel filed a motion to suppress the evidence seized incident to Hernandez's arrest, but withdrew it a week later. On March 10, defense counsel refiled the motion to suppress accompanied by Hernandez's affidavit. On May 4, the day scheduled for a bench trial, defense counsel asked the court to hear argument on Hernandez's motion to suppress. The court first noted that it had reviewed the preliminary hearing transcript and on the basis of that testimony would deny the motion. Defense counsel informed the court that there was insufficient information contained in the preliminary hearing transcript upon which it could determine whether there was sufficient probable cause for the officer's initial detention of Hernandez, an issue not addressed by the magistrate. The court agreed and told the prosecutor to go forward with its evidence on the suppression issue. The state objected pursuant to Rule 12(b) of the Idaho Criminal Rules, arguing that defense counsel had failed to file the motion to suppress within the proper deadlines. The court reconsidered its ruling and found that counsel's failure to timely file the motion constituted a waiver and then proceeded with the bench trial.

At the conclusion of the presentation of evidence, the district court found Hernandez

---

**3.** Whether Damron observed Hernandez urinating in the alleyway or elsewhere is not clear. At the trial, Damron testified that he "noticed that [Hernandez] was now urinating in the alleyway." However, at the post-conviction hearing, Damron testified that Hernandez urinated "in front of the residence."

**4.** The white powdery substances observed by Damron through the kitchen window turned out to be flour and sugar.

guilty of possession of methamphetamine and also found him to be a persistent violator under I.C. § 19-2514. The predicate offenses for the persistent violator sentencing enhancement were convictions for burglary from 1955 and possession of a controlled substance from 1984. On May 17, 1994, defense counsel filed a motion for a new trial, asserting that it was fundamental error for the court not to hear Hernandez's motion to suppress prior to trial. The motion for a new trial was denied and on November 29, 1994, Hernandez was sentenced to serve a unified ten-year sentence with five years fixed.[5]

Thereafter, Hernandez filed a *pro se* application for post-conviction relief. The state filed an answer and the district court held an evidentiary hearing. The parties stipulated to the admission of the preliminary hearing transcript and the state then called Officer Damron. On the basis of the testimony and transcripts, the court denied Hernandez's application for relief. The court determined that although trial counsel was ineffective for failing to file a timely motion to suppress, because the court would not have suppressed the evidence even if a timely motion had been filed, Hernandez could demonstrate no prejudice resulting from counsel's deficiency. On December 5, 1996, Hernandez filed this appeal.[6]

## II.

### STANDARD OF REVIEW

■ This Court has recognized that an application brought pursuant to the Uniform Post-Conviction Procedure Act (UPCPA), I.C. §§ 19-4901 to -4911, is an appropriate vehicle for considering claims of ineffective assistance of counsel. *Nellsch v. State*, 122 Idaho 426, 430, 835 P.2d 661, 665 (Ct.App. 1992). In order to prevail on an ineffective assistance of counsel claim, an applicant must demonstrate both that his attorney's performance was deficient, and that he was prejudiced thereby. *Hassett v. State*, 127 Idaho 313, 316, 900 P.2d 221, 224 (Ct.App.1995); *Davis v. State*, 116 Idaho 401, 406, 775 P.2d 1243, 1248 (Ct.App.1989). To show deficient performance, a defendant must overcome the strong presumption that counsel's performance was adequate by demonstrating that counsel's representation did not meet objective standards of competence. *Roman v. State*, 125 Idaho 644, 648-49, 873 P.2d 898, 902-03 (Ct.App.1994). If a defendant succeeds in establishing that counsel's performance was deficient, he must also show there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *Id.* at 649, 873 P.2d at 903.

■ Whether Hernandez was prejudiced by counsel's errors requires inquiry into whether the court would have granted Hernandez's motion to suppress if the motion had been timely filed. This Court employs a bifurcated standard for reviewing a trial court's ruling on a motion to suppress. This Court accepts the trial court's findings of fact unless they are clearly erroneous. *State v.*

---

**5.** Hernandez filed an appeal asserting that his motion to suppress should have been granted and that he was denied the effective assistance of trial counsel by her failure to file a timely suppression motion. In an unpublished opinion, *State v. Hernandez*, Docket No. 21797 (Ct.App. March 5, 1996), this Court declined to address Hernandez's arguments regarding the suppression motion because he was unable to demonstrate excusable neglect or good cause for the failure to timely file a motion to suppress. In addition, this Court declined to address Hernandez's assertion of the ineffective assistance of counsel with respect to the suppression motion and reserved that issue without prejudice so it could be pursued in a post-conviction relief action.

**6.** Due to a conflict of interest, a new defense counsel was appointed to represent Hernandez on appeal. This attorney was eventually sanctioned for failing to file an appellate brief and another attorney was appointed. An appellate brief was not filed until October 28, 1997. At oral argument in May of 1998, counsel for Hernandez orally moved to augment the record with the post-conviction hearing transcript, which *inexplicably* had not been made a part of the appellate record. Counsel later reduced the motion to writing and this Court granted the motion. However, the transcript was not lodged with this Court until September 15, more than four months following counsel's request. Following submission of the post-conviction hearing transcript, supplemental briefing was permitted and both parties submitted briefs on October 21, 1998.

*Spangler,* 130 Idaho 944, 945, 950 P.2d 1283, 1284 (Ct.App.1997). However, this Court will freely review the application of constitutional principles to the facts as found. *State v. Kilby,* 130 Idaho 747, 749, 947 P.2d 420, 422 (Ct.App.1997).

### III.

### ANALYSIS

Hernandez first argues that the trial court erred in determining that Officer Damron's initial detention of him was supported by reasonable, articulable suspicion. Because the issue is not determinative, we take no position as to the legality of the stop and *assume, without deciding* for purposes of this appeal, that Officer Damron had reasonable, articulable suspicion to make a *Terry* [7] stop and question Hernandez as he exited the vehicle.

▇▇▇▇ At oral argument, the state *conceded* that the arrest of Hernandez for urinating in public was unlawful.[8] Therefore, the propriety of Officer Damron's search of Hernandez, as incident to an arrest, now depends upon legal justification to arrest him on some other ground. We hold that the district court erred in concluding that the search of Hernandez was justified because the officer had probable cause to arrest him for an entirely unrelated offense.

In all of his testimony except that given at the post-conviction hearing, Officer Damron testified that he did not believe that he had probable cause to arrest Hernandez when Hernandez was initially detained on the front steps of the residence. Officer Damron's testimony indicates that he believed only that there was probable cause to arrest Hernandez for urinating in public, but no other offense. In fact, Officer Damron did not arrest Hernandez until after the search warrant proved fruitless and there appeared to be no basis for arresting Hernandez other than urinating in public. It was only after the district judge announced his belief at the post-conviction hearing that Officer Damron had probable cause to arrest Hernandez for obstructing a police officer that Damron testified as to his belief that Hernandez could be arrested for that offense.[9]

In urging this Court to affirm the trial court's decision, the state places great emphasis on *State v. Julian,* 129 Idaho 133, 922 P.2d 1059 (1996). In *Julian,* the Idaho Supreme Court reversed the district court's order granting the defendant's motion to suppress a vial of cocaine found during the course of a custodial search. The district court had concluded that the warrantless arrest of the defendant for misdemeanor domestic battery was unlawful because the defendant was arrested at a hospital rather than at the scene of a domestic disturbance. *Id.* at 136, 922 P.2d at 1062. Because the statute only allowed a warrantless arrest for misdemeanor domestic battery to be made at the scene of the disturbance and the disturbance did not occur at the hospital, the trial court ruled that the officers had no authority to arrest the defendant without a warrant and granted the motion to suppress. In reversing, a plurality of the Court concluded

---

**7.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We also note that the length of Hernandez's detention is not determinative of whether a valid *Terry* stop was converted into an arrest, legal or illegal. Rather, such a determination must take into consideration the totality of the circumstances. *See State v. Buti,* 131 Idaho 793, 964 P.2d 660, 663–64 (1998). However, when an investigative *Terry* detention exceeds the limited purpose for which it is allowed, the permissibility of the intrusion is determined by the same standard as a warrantless arrest. *State v. Cootz,* 110 Idaho 807, 810, 718 P.2d 1245, 1248 (Ct.App.1986).

**8.** Such a concession was hardly necessary. This Court finds that under the circumstances of twice being refused an opportunity to relieve

himself during a two-hour detention early in the morning, Hernandez's arrest for public urination was illegal and little more than a pretext for the purpose of discovering evidence to support another charge. *See State v. Barwick,* 94 Idaho 139, 142, 483 P.2d 670, 673 (1971).

**9.** In a preliminary statement to the parties, prior to Officer Damron's testimony, the court stated: "The officer—by Mr. Hernandez not obeying the command to stop and fleeing, the officer had probable cause at that time to arrest Mr. Hernandez for obstructing and delaying an officer in the performance of his duty." The court further stated that Hernandez "was formally arrested later for the urinating in public but he was legally arrested once he was not free to leave when he was ordered to stay on the steps."

that because the same objective facts upon which the domestic battery arrest was based would lead a person of ordinary prudence to conclude that probable cause existed to arrest the defendant for aggravated battery, a felony, the officers acted lawfully when they arrested the defendant without a warrant.[10] Thus, the *Julian* plurality stands for the proposition that when a defendant is improperly arrested for a specified charge, the court is not foreclosed from inquiring into whether an objective assessment of the *same operative facts* would support a finding of probable cause to arrest that defendant on other valid grounds.

The state argues that as in *Julian*, there are sufficient objective, operative facts in this case that would support probable cause to arrest Hernandez for an offense different from that relied upon by the officer, namely obstructing a police officer.[11] The state asserts that when Hernandez retreated inside the residence, Officer Damron's reasonable articulable suspicion to conduct a *Terry* stop ripened into probable cause to arrest because Hernandez failed to immediately obey Damron's request to stop. Furthermore, the state argues that Officer Damron's subjective doubts regarding probable cause to arrest Hernandez for obstructing a police officer are not material. *See State v. Cootz,* 110 Idaho 807, 718 P.2d 1245 (Ct.App.1986).

■ The state's reliance on *Julian* to justify the arrest and search incident thereto of Hernandez is misplaced. In *Julian,* the same operative facts giving rise to defendant's arrest for misdemeanor domestic battery provided probable cause for defendant's arrest for the felony of aggravated battery. However, the same operative facts giving rise to Hernandez's arrest for urinating in public do not provide probable cause for an arrest on any other basis. Rather, the state attempts to rely on wholly separate factual

circumstances to justify Hernandez's arrest well after the fact. This Court will not engage in *ex post facto* extrapolations of all crimes that might have been charged on a given set of facts at the moment of arrest to retroactively validate an otherwise unlawful arrest. *See United States v. Martinez,* 465 F.2d 79, 81–82 (2d Cir.1972).

■ Moreover, assuming *arguendo* that there may have been probable cause to arrest Hernandez for obstructing a police officer when he entered the residence over Officer Damron's request to stop, the fact remains that *at no time* during the next two hours was Hernandez placed under arrest for obstructing a police officer, nor was he ever charged with that offense.[12] Rather, this entire incident was treated as a *Terry* stop by the officer, and Hernandez dutifully complied and fully cooperated once he was summoned from the house. The state's argument is postured to provide hindsight justification for Hernandez's concededly illegal arrest for public urination. We will not permit the state to bootstrap an illegal arrest onto a retrospectively rationalized arrestable offense. *State v. Foldesi,* 131 Idaho 778, 780 n. 1, 963 P.2d 1215, 1217 n. 1 (Ct.App.1998) (noting that officers cannot "lift themselves by their bootstraps" by demanding to search a vehicle and, if the occupant says "no," using that resistance as an excuse to arrest the occupant). The objective actions of Officer Damron in detaining Hernandez through the execution of the search warrant were at all times consistent with a *Terry* stop, and at no time was Hernandez placed in "police custody" consistent with an arrest. *Compare. Cootz,* 110 Idaho at 810–11, 718 P.2d at 1248–49. It was only *after* the search warrant was fully executed and proved fruitless that Hernandez was arrested.

---

10. We note that this portion of the Court's opinion was supported by only two members; two other members of the Court concurred in the result on wholly different grounds and one member of the Court dissented. Thus, the precedential value of this portion of the Court's opinion is questionable.

11. A person resists or obstructs a police officer when he or she "wilfully resists, delays or obstructs any public officer, in the discharge or attempt to discharge, of any duty of his office ..., when no other punishment is prescribed...." I.C. § 18–705.

12. Officer Damron testified that Hernandez had pled guilty to the urinating in public charge.

Because Hernandez's arrest was unlawful and the .068 grams of methamphetamine found incident thereto should have been suppressed had a timely motion to suppress been filed by defense counsel, we find that Hernandez has demonstrated that he was prejudiced by defense counsel's judicially determined ineffective assistance. Accordingly, we reverse the décision and order of the district court dismissing Hernandez's petition for post-conviction relief. We remand this case for proceedings consistent with this opinion, namely the setting aside of Hernandez's judgment of conviction and the suppression of all evidence seized incident to his illegal arrest.

Chief Judge LANSING, and Judge PERRY, concur.

SCHWARTZMAN, J., also specially concurring.

There is an old maxim in the law that states, "hard cases make bad law." Hopefully, the converse is true, i.e. that "easy cases make good law." This is an *easy* case! Despite its easiness, however, there are some points of professional concern—and personal uneasiness—that require additional comments.

If necessary to the decision, I would have been strongly inclined to rule that the initial police encounter with Hernandez, in stopping and forcibly detaining him outside his residence of destination, was not a valid *Terry* stop because it was based, in my opinion, on nothing more than hunch and conjecture. While the "reasonable suspicion" standard requires less than probable cause, it does mean something more than "speculation" or "instinct" on the part of an officer. *State v. Emory,* 119 Idaho 661, 664, 809 P.2d 522, 525 (Ct.App.1991); *see also State v. Myers,* 118 Idaho 608, 613, 798 P.2d 453, 458 (Ct.App. 1990) (knowledge of prior drug activities does not give rise to a particularized suspicion that a crime was being committed). Nor does some vague reference to a so-called "furtive movement" elevate the relatively innocuous and innocent behavior the officer observed (or thought he observed) into the realm of "reasonable suspicion." *See People v. Superior Court of Yolo County,* 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (1970). In effect, *anyone* leaving a bar with another individual in the early morning hours would be subject to this type of forced/intrusive stop and accounting for one's presence over and above a voluntary encounter in the spirit of cooperation which the law clearly allows between law enforcement and the citizenry.

Given the totality of the circumstances outlined in the factual portion of this opinion, Hernandez's arrest for urination in public—after leaving a bar around 12:42 a.m. and then being detained for up to two hours, having asked twice to relieve himself and being told to "hold it"—is nothing short of constitutional CHUTZPA![13] *See United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *State v. Lively,* 130 Wash.2d 1, 921 P.2d 1035, 1045 (1996). The officer's logic, that if he let Hernandez urinate in the alley, he (the officer) would somehow be aiding and abetting a crime of public urination—even at this *wee* morning hour outside the same residence Hernandez entered—strikes me as legally ludicrous— about as ludicrous as arresting Hernandez for obstructing a police officer by failing to "hold it" (his urine) in response to the command to "hold it!" In effect, to avoid arrest, Hernandez had to literally urinate in his own pants and sit there until the search warrant was fully executed. Surely, our system of justice can do better than this!

After such a prolonged detention, wherein the net result of the search warrant was the finding of large quantities of *sugar and flour*—substances the Idaho Legislature has not seen fit to criminalize—and being forced to hold his urine until he could no longer hold it, Hernandez just might be entitled to the courtesy of some small word of acknowledgment for his cooperation. Instead, he is unceremoniously hauled off for public urination, and incident to his arrest, .068 grams of methamphetamine is found in his sock. Converting from the metric system to American weights and measures, .068 grams equals *less*

---

**13.** Chutzpa is a word derived from the Yiddish language and used frequently in colloquial English to mean or infer unmitigated gall, shameless arrogance, and/or brazen nerve.

*than* one-four-hundredth (¼₀₀) of an ounce! Because we hold that the arrest was illegal, this minuscule amount of evidence must now be suppressed. Perhaps the United States Supreme Court summed this principle up best when it said:

> To repeat, an arrest is not justified by what the subsequent search discloses. Under our system suspicion is not enough for an officer to lay hands on a citizen. It is better, so the Fourth Amendment teaches, that the guilty sometimes go free than that citizens be subject to easy arrests.

*Henry v. United States,* 361 U.S. 98, 104, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

As if to add insult to injury, and as if a potential seven-year prison term [14] is not enough for the possession of less that ¼₀₀ of an ounce of methamphetamine, the Canyon County Prosecuting Attorney's Office elected to charge the defendant as a persistent violator and extend the maximum sentencing jurisdiction to a possible prison term of *life* imprisonment, with not less than five years to be imposed at a minimum. This is so despite the fact that one of the two prior felonies identified was almost *forty years old*—a burglary conviction out of Texas in *1955*.

Next, Hernandez's attorney fails to timely file a motion to suppress, so that the issues of the legality of the stop, detention, and arrest cannot even be raised at trial and preserved for appeal in case the motion to suppress is denied. He is thus convicted and sentenced to the Idaho State Penitentiary on November 29, 1994, to serve ten years, with five years fixed before parole eligibility. It is only from prison that Hernandez must begin anew the slow and tedious process of re-litigating his conviction through the Uniform Post Conviction Procedure Act.

Now, over four (4) years later, his conviction is to be overturned and he will be released from an imprisonment based upon an illegal arrest. Unfortunately, Hernandez got chewed up in the system, which seemingly let him down at every juncture. For him, justice took a four-year holiday.

---

**14.** The maximum sentence for possession of methamphetamine is incarceration not to exceed seven years. I.C. § 37–2732(c)(1).