47 P.3d 763

STATE of Idaho, Plaintiff–Respondent,

v.

Victor SALATO, Defendant–Appellant.

No. 26710.

Court of Appeals of Idaho.

Dec. 13, 2001.

Rehearing Denied Feb. 20, 2002.

Review Denied June 6, 2002.

Alan E. Trimming, Ada County Public Defender; David J. Smethers, Deputy Public Defender, Boise, for appellant. David J. Smethers argued.

Hon. Alan G. Lance, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent. Lori A. Fleming argued.

SCHWARTZMAN, Chief Judge.

Victor Salato appeals the district court's denial of his motion to suppress evidence obtained after a stop initiated on suspicion of robbery. We affirm.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented by the state indicates that shortly before 10 p.m. on December 19, 1999, Rebecca Preece stopped at the M & W market on Warm Springs to buy gasoline. There, she saw a streamlined, late-model, maroon car with three men in it speed through the parking lot, stop abruptly, and then speed away about five seconds later. One of the men had a shaved head or was wearing a hooded light colored jacket. Preece suspected that the men were "scoping out the place," and she tried to take down the license plate number, but only got down

"1A" before the car drove off. Preece proceeded on her way home.

At about 10 p.m. that same evening Shannon Skillern was working as a cashier at the same M & W Market when a man walked up to her, pulled out a black semi-automatic handgun, cocked it, and said, "Give me all your money." Skillern gave the man all the cash in her register drawer. The man left and Skillern reported the robbery, describing the perpetrator as thin, somewhat short, with a black mustache and big nose, wearing dark blue sweatpants with silver stripes down the leg, and a light hooded jacket or sweatshirt.

A friend of Preece saw the large police presence at the M & W. Knowing that Preece had gone to the M & W on her way home, the friend called her on her cell phone to make sure that she was all right. Preece told the friend what she has seen earlier and was urged to call the police. Preece reported what she had seen shortly after 10:30 p.m. Preece's report was relayed to officers in the field.

At about the same time as Preece's call to the police, April Tucker, accompanied by her daughter, was working at the Jackson's Food Store on Latah Street when a man walked up to her at the counter and demanded money. The man pulled out a semi-automatic handgun, cocked it, and pointed it at Tucker's daughter. Tucker handed the man some cash and the man fled on foot. When the police arrived, Tucker and her daughter each gave a statement and a description of the perpetrator as a hooded Hispanic-looking male closely matching that of the M & W robber.

At 10:35 p.m., Boise Officer Brent Reiber was dispatched to Jackson's and given a description of the perpetrator of both the M & W and the Jackson's robberies. Reiber was aware of the M & W robbery and the earlier reports describing the robber and a late model, streamlined maroon vehicle occupied by three persons. Because other patrol units arrived at the Jackson's first, Reiber conducted an area search. About one block away from the Jackson's, Reiber saw a late model, streamlined maroon Dodge Intrepid with a passenger who appeared to have a shaved head. Although Reiber did not see any traffic violations, he nevertheless initiated a high-risk traffic stop on suspicion of robbery.

Reiber ordered the two visible occupants out of the car and patted them down. When Reiber asked if anyone else was in the car, he was told that a third person was passed out on the back seat. After all the occupants were removed from the car, the driver was identified as Victor Salato, his front seat passenger as Ivar Havneros, and the back seat passenger as Enes Djuric. Reiber obtained Salato's consent to search the car and the officers found ammunition and money, but no gun.

At about 11 p.m., Boise City Police detective Dave Smith drove Skillern from the M & W to the location where Reiber had stopped Salato. There, Skillern was able to identify Djuric as the M & W robber based upon his big nose, thin mustache, and blue sweatpants with a silver stripe. Preece also arrived at the traffic stop location, where she identified the Intrepid as the same maroon car she had seen at the M & W. She also identified a silver/light colored jacket with a hood as the jacket she had seen on the man in the car outside the M & W.

Salato, Havneros, and Djuric were taken into custody. At the Detective's Division offices, Boise City Police detective Lance Anderson *Mirandized*[1] Salato. Salato initially waived his *Miranda* rights, but then invoked his right to counsel. Anderson terminated the interview at that point. Anderson then went about taking victim and witness statements, periodically checking on Salato and informing him that he would soon be taken to the jail and held for the robberies.

When Anderson thereafter told Salato that he would be taken to the jail just as soon as the other suspects finished writing up their confessions, Salato said that he too wanted to confess, if his friends had done so. Salato was told that it was unusual for a suspect to talk to the police after invoking the right to counsel and that, if he wanted to discuss his involvement in the robberies, he needed to go

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

on the record and explain that he, not the police, had reinitiated the discussion. After Salato explained his desire to speak to Anderson and after listening to the tape of Djuric's confession, Salato explained that he owned the gun—a black Russian-made .380-caliber semi-automatic pistol—and that he drove Havneros and Djuric to the M & W so that Djuric could rob it. Salato said that he parked behind the M & W and waited for Djuric to get back to the car. Salato said that Havneros divided the money among the three of them. After they left, Havneros and Djuric discussed robbing another store, and Salato drove them to the Jackson's. After Djuric robbed the Jackson's, Havneros again split the money among the three of them. Salato then drove home and stowed his gun and part of his share of the cash and was driving Havneros home when they were pulled over by the police.

Salato was charged with two counts of robbery, I.C. §§ 18–6501, 18–6502, each count enhanced for use of a firearm during the commission of a crime, I.C. § 19–2520. Following the preliminary hearing, counsel for Salato filed a motion to suppress the evidence gathered from the stop and subsequent interviews. At the hearing on Salato's motion to suppress, counsel for Salato asked the court to take judicial notice of the preliminary hearing transcript, which contained Tucker's testimony. Thereafter, the officers, Preece and Skillern testified as set forth above. After considering the evidence adduced at the suppression hearing, the district court denied Salato's motion, concluding that Reiber had the requisite reasonable suspicion to stop the maroon car and its occupants, that the car was searched with Salato's consent, and that Salato's confession to Anderson was voluntary. Salato was found guilty following a jury trial and sentenced to a prison term of twenty-five years, with seven years fixed. He appeals his conviction, arguing that the district court erred in denying his motion to suppress.

## II.

### STANDARD OF REVIEW

▮▮▮ In evaluating a ruling on a motion to suppress, we defer to factual findings of the trial court unless they are clearly erroneous, but we freely review the trial court's determination as to whether constitutional standards have been satisfied in light of the facts found. *State v. Morris,* 131 Idaho 562, 565, 961 P.2d 653, 656 (Ct.App.1998); *State v. Pick,* 124 Idaho 601, 603, 861 P.2d 1266, 1268 (Ct.App.1993); *State v. Heinen,* 114 Idaho 656, 658, 759 P.2d 947, 949 (Ct.App.1988). The reasonableness of a given search or seizure is a question of law requiring our independent review. *Morris,* 131 Idaho at 565, 961 P.2d at 656; *State v. McIntee,* 124 Idaho 803, 804, 864 P.2d 641, 642 (Ct.App.1993); *Heinen,* 114 Idaho at 658, 759 P.2d at 949. Accordingly, we exercise free review. *See State v. Reese,* 132 Idaho 652, 653, 978 P.2d 212, 213 (1999).

## III.

### BASIS FOR THE INITIAL STOP

#### A. Applicable Constitutional Standards

▮▮▮ The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. When a defendant challenges the validity of a vehicle stop, the burden is on the state to prove that the stop was justified. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236–37 (1983); *State v. Sevy,* 129 Idaho 613, 614–15, 930 P.2d 1358, 1359–60 (Ct.App.1997). To pass constitutional muster, an investigative detention must be based upon reasonable suspicion, derived from specific articulable facts that the person stopped has committed or is about to commit a crime. *Royer,* 460 U.S. at 498, 103 S.Ct. at 1324, 75 L.Ed.2d at 236–37; *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889, 905–06 (1968); *Sevy,* 129 Idaho at 615, 930 P.2d at 1360. Reasonable suspicion may arise from a citizen's report of criminal activity. Whether information from such a source is sufficient to create reasonable suspicion depends upon the content and reliability of the information presented by the source, including whether the informant reveals his/her identity and the basis of his/her knowledge. *See Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110

L.Ed.2d 301, 308–09 (1990); *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612, 617–18 (1972). *See also Wilson v. Idaho Transp. Dep't,* 136 Idaho 270, 274–75, 32 P.3d 164, 168–69 (Ct.App.2001); *State v. Larson,* 135 Idaho 99, 101, 15 P.3d 334, 336 (Ct.App. 2000) (both regarding the presumed reliability of identified citizen reports). Reasonable suspicion is a less demanding standard than probable cause. *State v. Gallegos,* 120 Idaho 894, 896, 821 P.2d 949, 951 (1991). "Further, where officers know that a serious felony has just been committed, the question is narrowed to whether there is a reasonable suspicion that the person under observation is connected with the crime." *State v. Gascon,* 119 Idaho 923, 928, 811 P.2d 1103, 1108 (Ct. App.1989).

 The reasonableness of a stop is determined by looking at the totality of the circumstances confronting the officer at the time of the stop. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621, 628–29 (1981); *State v. Osborne,* 121 Idaho 520, 526, 826 P.2d 481, 487 (Ct.App.1991). "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez,* 449 U.S. at 417–18, 101 S.Ct. at 694–95, 66 L.Ed.2d at 628–29.

**B. Discussion**

 The district court concluded that Reiber's stop of Salato's car was based upon reasonable suspicion that the vehicle and its occupants had been involved in two immediately preceding robberies.

Salato maintains that the record does not support the district court's factual finding that Reiber had descriptions of the perpetrator from both the M & W robbery and the Jackson's robbery. From our review of the record, we note that Reiber testified at the suppression hearing that at the time he saw the maroon car he was aware of the physical description of the robber from both the M & W robbery and the Jackson's robbery. Thus, there is substantial and competent evidence to support the district court's factual

finding that Reiber possessed descriptions of the robber from both robbery locations.

Salato argues that Reiber initiated the traffic stop based solely on the color of the car he observed a block away from the Jackson's robbery location. At the suppression hearing Reiber testified that *before* he initiated the stop he saw that the vehicle matched the description given over the radio and that the passenger matched the description of the perpetrator of the robberies. Accordingly, we reject Salato's suggestion that the only articulable fact available to Reiber at the time of the stop was the color of the car.

 Additionally, Salato challenges the evidentiary basis for the admission of certain facts at the hearing on his motion to suppress. He argues that Reiber's testimony about the description of the Salato's maroon car was hearsay. We reject this argument. The articulable facts supporting reasonable suspicion, while usually grounded in an officer's personal perceptions and inferences, may in appropriate circumstances be based upon external information, such as an informant's tip conveyed through police dispatch. *Wilson,* 136 Idaho at 275–76, 32 P.3d at 169–70 (citing *Larson,* 135 Idaho at 102, 15 P.3d at 337). An officer receiving a radio dispatch may be expected to take the message at face value and act upon it. *Wilson,* 136 Idaho at 275, 32 P.3d at 169. Thus, Reiber had a right to rely upon information relayed from police dispatch because that information came from an identified citizen witness. *See State v. O'Bryan,* 96 Idaho 548, 552, 531 P.2d 1193, 1197 (1975); *Larson,* 135 Idaho at 101–02, 15 P.3d at 336–37.

In further argument, Salato asserts that the record does not support the district court's finding that physical descriptions of the M & W and Jackson's robber were similar. We conclude that the details given by the victims to Reiber via police dispatch, coupled with the proximity of the maroon car one block from the second robbery location within a few minutes after that robbery occurred, were all articulable facts giving rise to reasonable suspicion supporting a stop.

Reiber was aware that the robber of both the Jackson's and the M & W had a darker complexion, described as possibly Hispanic, wearing a hood cinched down tightly around his face, and that a hooded or shaved-headed person had been one of three persons seen in a late model streamlined maroon car parked outside the M & W almost immediately before the M & W robbery. Thus, when Reiber, on route to the Jackson's, saw a late model, streamlined maroon car with a possibly Hispanic passenger who appeared to have a shaved head within five minutes of and only one block from the Jackson's robbery, he had reasonable suspicion to conduct a brief investigative stop on suspicion of robbery. On the facts of this case, the descriptions of the M & W and Jackson's robbers were sufficiently similar that, when combined with the vehicle description, there were reliable, articulable facts and circumstances giving rise to reasonable suspicion that the vehicle and its occupants were connected with the robberies. *Gascon,* 119 Idaho at 928, 811 P.2d at 1108; *State v. Kysar,* 116 Idaho 992, 783 P.2d 859 (1989).

■■■■ We also hold that because of the violent nature of the crime, Reiber was justified in treating the maroon vehicle's occupants as armed and dangerous, ordering them out of the automobile and handcuffing them. *State v. Gascon,* 119 Idaho 932, 934, 812 P.2d 239, 241 (1991). During a lawful traffic stop, the officer may instruct the driver to exit the vehicle or to remain inside. This procedure is within the police officer's discretion and is not otherwise unlawful. *Pennsylvania v. Mimms,* 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 331, 54 L.Ed.2d 331, 337 (1977); *State v. Parkinson,* 135 Idaho 357, 363, 17 P.3d 301, 307 (Ct.App.2000). The use of handcuffs may also be justified during a perceived high-risk investigative stop. *See State v. DuValt,* 131 Idaho 550, 554, 961 P.2d 641, 645 (1998); *State v. Frank,* 133 Idaho 364, 368, 986 P.2d 1030, 1034 (Ct.App.1999).

■■■■ Once the third person was detained, Reiber held the driver and his passengers until the arrival of Preece and Skillern, who shortly thereafter identified both the car and the robber. Such temporary detentions do not violate the Fourth Amend-

ment if they are based upon a reasonable, articulable suspicion that the person who is stopped has committed or is about to commit a crime. *Royer,* 460 U.S. at 498, 103 S.Ct. at 1324, 75 L.Ed.2d at 236–37; *DuValt,* 131 Idaho at 553, 961 P.2d at 644. Even a more prolonged detention may be justified where an in-the-field "show up" is the least intrusive means of dispelling reasonable suspicion. *State v. Buti,* 131 Idaho 793, 796–98, 964 P.2d 660, 663–65 (1998) (an investigative stop of defendant's car for forty-five minutes following burglary, until witness arrived and made show up identification, was a diligent and reasonable action by the police officer to confirm or dispel reasonable suspicion and did not convert the stop into an arrest); *see also Kysar,* 116 Idaho at 994, 783 P.2d at 861. Reiber had reasonable suspicion to hold Salato, Havneros, and Djuric for about a half-hour until Skillern arrived. In doing so, Reiber arguably employed the least intrusive means reasonably available to verify or dispel reasonable suspicion in a short period of time. *Parkinson,* 135 Idaho at 361, 17 P.3d at 305 (citing *Royer,* 460 U.S. at 500–01, 103 S.Ct. at 1325–26, 75 L.Ed.2d at 238–39).

Accordingly, we hold that this detention for witness identification purposes was constitutionally reasonable.

## IV.

### THE INITIAL AUTOMOBILE SEARCH AND ARREST

Salato argues that his consent to the search of his car was coerced due to the circumstances of the stop—officers with their guns drawn, ordering everyone out of the car, frisking them and placing them in police cars. Salato challenges the initial search of his car at the scene during which money and ammunition, but no gun, were found. He does not challenge a later post-arrest search conducted after his car had been impounded. Thus, we only address the initial search. The district court concluded that Salato voluntarily consented to a search of his car. This conclusion is supported by the evidence.

■■■■ We note that Salato was not under arrest at the time his vehicle was searched.

The mere fact that the officers exercised a reasonable degree of caution in detaining Salato and his two passengers does not necessarily coerce Salato's consent. Both Reiber and Anderson testified that they explained the reasons for the stop—a robbery investigation. At the time Salato was asked for and consented to a search of his car, he was not being threatened, intimidated or cajoled, but was being lawfully detained and sitting unhandcuffed in the back of a patrol car. Accordingly, the district court did not err in finding and concluding that Salato voluntarily consented to a search of his car.[2]

■ Salato finally argues that he was arrested without probable cause. We disagree, but need not address the issue because Salato failed to raise this issue in his motion to suppress and thus the issue was not raised before the district court. This Court has repeatedly held that issues raised for the first time on appeal will not be considered. *State v. Russell*, 122 Idaho 488, 490, 835 P.2d 1299, 1301 (1992); *State v. Lavy*, 121 Idaho 842, 844, 828 P.2d 871, 873 (1992).

## V.

### SALATO'S POST–ARREST STATEMENTS

Salato argues that his post-arrest statements to Anderson should have been suppressed because he had invoked his right to counsel prior to Anderson's second interview with him. We disagree.

■ It is well accepted that when an accused person in custody has invoked his right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that person is not to be subjected to further interrogation until counsel has been made available to him, unless he waives his earlier request for counsel and re-initiates any dialogue. *Edwards v. Arizona*, 451 U.S. 477, 485–86, 101 S.Ct. 1880, 1885–86, 68 L.Ed.2d 378, 386–87 (1981); *Kysar*, 116 Ida-

ho at 996, 783 P.2d at 863. Any responses to further interrogation are admissible only when it is shown by a preponderance of the evidence that the accused initiated further discussions and he knowingly and intelligently waived his right to counsel which he had earlier invoked. *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488, 493–94 (1984); *State v. Cheatham*, 134 Idaho 565, 574–75, 6 P.3d 815, 824–25 (2000); *Kysar, supra.* When statements made by a defendant during the course of an in-custody interrogation are offered at trial, the State "must establish a voluntary, knowing and intelligent waiver of the suspect's rights." *State v. Luke*, 134 Idaho 294, 297, 1 P.3d 795, 798 (2000). A trial court's determination that a defendant made a knowing and voluntary waiver of his *Miranda* rights will not be disturbed on appeal unless it can be shown that such a conclusion is not supported by substantial and competent evidence. *State v. Varie*, 135 Idaho 848, 851–52, 26 P.3d 31, 34–35 (2001) (citing *Luke*, 134 Idaho at 297, 1 P.3d at 798; *State v. Mitchell*, 104 Idaho 493, 498, 660 P.2d 1336, 1341 (1983)).

■ Interrogation is defined as not only express questioning but also its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 307–08 (1980). The functional equivalent of interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 307–08 (footnote omitted). We use an objective test to determine whether questioning constitutes interrogation. *See, e.g., United States v. LaPierre*, 998 F.2d 1460, 1466–67 n. 6 (9th Cir.1993); *see also Frank*, 133 Idaho at 370, 986 P.2d at 1036. Police are not held accountable for the unforeseeable results of their words or actions. *Innis*, 446 U.S. at 301–02, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308–09.

---

**2.** We note that after Preece and Skillern had identified the car and Djuric, a search of the passenger compartment of the car would have been justified under the *Carroll* doctrine, i.e., probable cause to believe that the vehicle was connected with two robberies and contained evi-

dence of the crimes. *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419, 428–29 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *State v. Lopez*, 107 Idaho 726, 738, 692 P.2d 370, 382 (Ct.App.1984).

■ Salato was not subject to express questioning when Anderson told him that he would be taken to the jail as soon as Djuric and Havneros were done writing up their confessions. Thus, we must consider whether Anderson's statement was the functional equivalent of questioning by examining whether it was reasonably likely to elicit an incriminating response. In *Innis,* the Supreme Court held that two officers' dialogue in the presence of the defendant regarding the possibility that a handicapped child would find the gun the defendant had used in committing a murder and a robbery did not constitute interrogation in violation of *Miranda.* 446 U.S. at 302–03, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308–09. *Innis* excludes from the definition of interrogation words or actions "normally attendant to arrest and custody." *Id.* at 301, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308. The Ninth Circuit has suggested that when an officer informs a defendant of circumstances which contribute to an intelligent exercise of the defendant's judgment, this information may be considered normally attendant to arrest and custody. *United States v. Crisco,* 725 F.2d 1228, 1232 (9th Cir.1984). It is important to note that Anderson was not lying to Salato when he informed him of the reason for his delayed transportation to the jail. Additionally, Anderson's statement did not objectively call for nor solicit an incriminating response. While it may have struck a responsive chord in Salato, being informed that Djuric and Havernos had confessed was not the functional equivalent of interrogation. *See Innis,* 446 U.S. at 303, 100 S.Ct. at 1690–91, 64 L.Ed.2d at 309 *United States v. Moreno–Flores,* 33 F.3d 1164 (9th Cir.1994). From this, we conclude that Anderson's statement is properly characterized as one normally attendant to arrest and custody rather than a statement objectively likely to elicit an incriminating response. *See United States v. Allen,* 247 F.3d 741, 765–66 (8th Cir.2001) (keeping a suspect informed of the progress of the investigation and status of charges against him should be encouraged so long as the communication is truthful and not designed or likely to elicit an incriminating response); *United States v. Foster,* 227 F.3d 1096, 1101–04 (9th Cir.2000).

■ Salato argues that he was not re-*Mirandized* prior to the second interview with Anderson. He further asserts that Anderson's statement that Djuric and Havneros had confessed was a re-initiation of questioning after he had invoked his right to counsel terminating the earlier interview. Anderson initially *Mirandized* Salato, obtained a signed notification of rights and voluntary waiver, and interviewed him. After Anderson told Salato that he was lying about his lack of involvement, and that the stolen money was marked and he had been videotaped at one of the robbery scenes, Salato invoked his right to counsel and all questioning stopped.

Because all the secure interview rooms were occupied, Salato was left seated at Anderson's desk in his office. While supervising the interrogation of Djuric and Havneros, Anderson periodically checked on Salato and, some minutes after the interview had terminated, told him that he would be transported to the jail just as soon as Djuric and Havneros had finished writing up their confessions. Salato then said that he wanted to confess, if his friends had done so.

Anderson reminded Salato that he had invoked his right to counsel and said that in order to talk they would need to go on the record and reiterate that Salato was the one reinitiating the interview. The tape recorder was turned on, Anderson summarized the events, including the fact that Salato had previously been read his *Miranda* rights, understood them and waived them by agreeing to speak. Salato said that he understood he was waiving his right to counsel and that he wanted to speak with Anderson. Anderson then played a tape of Djuric's confession. While Salato was not given a second *Miranda* warning, he again acknowledged his right to speak to a lawyer, indicated that he no longer wished to talk to a lawyer and that his decision to speak to Anderson without a lawyer was voluntary. Salato then confessed to owning the gun—a black Russian made .380 caliber semi-automatic pistol, to driving Havneros and Djuric to the M & W and the Jackson's so that Djuric could rob the stores, and to taking a third of the money as his cut.

We conclude that Andersons conduct did not violate Salatos Fifth Amendment rights under *Miranda.* The district court did not err in denying Salatos motion to suppress.

## VI.

## CONCLUSION

The district courts order denying Salatos motion to suppress is affirmed.

Judge LANSING and Judge PERRY CONCUR.