104 P.3d 976

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Mark Allen PERSON, Defendant–Appellant.**

No. 29517.

Court of Appeals of Idaho.

Aug. 16, 2004.

Review Denied Dec. 20, 2004.

1. Justice Kidwell voted to concur prior to his retirement on January 1, 2005.

Molly J. Huskey, State Appellate Public Defender; Christopher D. Schwartz, Legal Intern, Boise, for appellant. Christopher D. Schwartz argued.

Hon. Lawrence G. Wasden, Attorney General; Rebekah A. Cude', Deputy Attorney General, Boise, for respondent. Rebekah A. Cude' argued.

GUTIERREZ, Judge.

Mark Allen Person appeals from the judgment entered upon his conditional plea of guilty to second degree murder. For the reasons stated below, we reverse and remand.

## I.

### FACTUAL AND PROCEDURAL SUMMARY

Mark Allen Person moved in a circle of acquaintances heavily involved in the drug culture. A focal point of activity for this group was a drug house run by a woman named Carla, also known as "Mom." Person and Eric Christensen, another member of this group, formed a temporary partnership at Mom's direction to "cook up" a batch of methamphetamine. This endeavor was unsuccessful, leading to an altercation between the men.

Subsequently, Person, Christensen, and a female acquaintance named Joi drove to Christensen's house to retrieve the paraphernalia needed by the group to again try to manufacture the drug. On the way to Christensen's house, the three decided to stop at a pullout on Bogus Basin Road in order to use methamphetamine. After injecting the drug, Person began to fight with Christensen over remarks Christensen had made during their previous altercation.

Christensen's body, his throat slit twice, was later found by police in a wooded area near Bogus Basin Road. Person was arrested three days later and taken to the Ada County Sheriff's Office for questioning. The district court made the following factual findings with regard to the videotaped interrogation:

> The Court has viewed all of the videotapes made in the interrogation room at the request of both parties. The first tape shows Person alone in the room for about an hour and twenty minutes. He looks clean and shaven, and is wearing clean clothes but no shoes. He is drinking a soft drink. On many occasions, he appears to be dozing off. His head drops forward and then comes back up again. However, he never appears to sleep for any length of time, and most of the time, even when he appears to be nodding off, his feet are moving.

> At the beginning of the second tape Detective Pat Schneider of the Ada County Sheriff's Office and Detective Kevin Hudgens of the Idaho State Police enter the interrogation room. Schneider asks Person if he is waking up yet, and he responds that he is. Person then gives clear responses to questions concerning his age, birth date, social security number and other identifying information. Detective Schneider asks Person to read aloud the

Miranda [1] warnings, which he does fluently and then signs a written waiver of those rights. It is apparent from his comments that he knows and understands these rights and the effect of a waiver, and that he already has a lawyer. The interrogation then begins concerning the events in question, and Person immediately and unambiguously invokes his right to have counsel present. Both of the officers cease questioning and leave the room.

Approximately six minutes later, Detective Hudgens re-enters the interrogation room and reads the arrest warrant to Person. At that point, the following [ex]change takes place:

Person: Right, well, I was correct in . . . correct in my thinking, um, as far as four days.

Hudgens: Pardon?

Person: As far as uh, when you asked me about uh, four days ago and you know, Friday, so . . . and I knew . . . and that's why I'm talking to everybody today so . . . and no, I didn't murder . . . no, I didn't murder anybody. . . .

Hudgens: If you want to tell us something . . . now is the time to do it.

Person: I know some s——, okay? Do I need a lawyer, I mean, tell me the truth though please, cause I'm f——ing scared as hell.

Hudgens: I can't answer that for you.

Person: I know you can't, but do I need my lawyer? Or I mean . . . cause to me it doesn't really matter because I'm going to repeat it the same way, I mean, unless I tell you now or I'm going to say it the same way it happened when she's here too. I can tell you . . . I can tell you. . . .

Hudgens: I can't . . . I can't answer that question for you. I can't say (inaudible).

Person: I mean . . . uh, yeah I mean, that's fine. Yeah I will talk to you guys now, okay? Um, I mean, I know what we're talking about alright?

Schneider re-enters the room and Person begins to relate the events leading up to Christensen's death.

At one point, Hudgens indicates he thinks Person is "tweaking," a drug term, and Person seems to concur. Later, however, he states that he is not "tweaking." At a later point Hudgens breaks into Person's narrative of events with a question, at which time Person indicates that he is feeling pressure and has a personality conflict with Hudgens. It appears that the "pressure" is not pressure to talk, since Person then resumes the narrative addressing Detective Schneider. Throughout the tapes, Person is articulate and coherent, although vague as to dates and time. He does mention being tired, and occasionally takes breaks from the narrative to discuss innocuous topics, but returns to the narrative each time. He does not nod off during this time.

Finally, late in Tape 3, after describing a version of the death of Eric Christensen, Person again unequivocally invokes his right to counsel, but continues to make statements concerning a different version of the crime even though the officers ask no questions. The officers leave the room again. A few minutes later, an officer, apparently Schneider, re-enters the room and asks Person if he has any questions he wants to ask the officer, indicating that he doesn't mind talking to Person, but wants to make sure, before he does so, that Person is again waiving his right to have counsel present. They then discuss the Miranda rights in the context of the right to counsel and, when asked if he understands these rights, Person says "yes, I'll talk to you." Person then makes further incriminating statements.

After being charged with first degree murder, Person filed a motion to suppress his incriminating statements, which the district court denied. Person entered a Rule 11 conditional guilty plea to the amended charge of second degree murder. The district court entered judgment and imposed a unified sentence of life imprisonment with twenty years determinate. Person appeals.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## II.

### STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact which are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson,* 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct.App.1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez–Molina,* 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers,* 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct.App.1999).

## III.

### ANALYSIS

On appeal Person argues that the district court erred by determining that he had freely and voluntarily waived his right to remain silent and his right to counsel during his interrogation. Person also asserts that the district court abused its discretion by imposing an excessive sentence, but we do not reach this issue.

### A. Waiver of Constitutional Rights

#### 1. Voluntariness of waiver

■ Person contends that his statements to police during the three-hour interrogation should have been suppressed. In particular, Person argues that he was in the midst of, and suffering from, an extended methamphetamine binge and did not therefore have the mental capacity to knowingly, voluntarily, and intelligently waive his right to remain silent.

■ When statements made by a defendant during the course of an in-custody interrogation are offered at trial, the state must establish a voluntary, knowing, and intelligent waiver of the suspect's rights. *State v. Luke,* 134 Idaho 294, 297, 1 P.3d 795, 798 (2000). On appeal, this standard is measured by reviewing the totality of the circum-

stances surrounding the waiver. *State v. Dunn,* 134 Idaho 165, 169, 997 P.2d 626, 630 (Ct.App.2000). The underlying purpose of this standard is to determine whether the defendant's will was overborne. *State v. Radford,* 134 Idaho 187, 191, 998 P.2d 80, 84 (2000). A trial court's determination that a defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights will not be disturbed on appeal unless it can be shown that such a conclusion is not supported by substantial and competent evidence. *State v. Varie,* 135 Idaho 848, 851–52, 26 P.3d 31, 34–35 (2001); *State v. Salato,* 137 Idaho 260, 267, 47 P.3d 763, 770 (Ct.App. 2001).

■ The following factors must be considered in determining whether a confession was voluntary:

(1) Whether *Miranda* warnings were given;

(2) The youth of the accused;

(3) The accused's level of education or low intelligence;

(4) The length of the detention;

(5) The repeated and prolonged nature of the questioning; and

(6) Deprivation of food or sleep.

*State v. Doe,* 137 Idaho 519, 523, 50 P.3d 1014, 1018 (2002). The district court specifically found that:

. . . .

Except for the first tape, Person is awake, alert, and articulate throughout the interview, which lasted about three hours. There is no indication that he could hardly stay awake on the other two tapes.... Virtually every time Person indicated that he was tired and needed a break, he was given one or the topic was changed to casual conversation. In fact, it is not clear from the tapes that Person was indicating he was physically tired, or tired of the situation ... although Person indicted [sic] that he may have been 'tweaking' at some point, he later indicated that he wasn't 'tweaking.' It does not appear that Person's drug use caused him to talk uncontrollably.

Person does not contend that these factual findings are clearly erroneous. Rather, he asks us to reevaluate the evidence, particularly that evidence he believes weighs in his favor, irrespective of whether his offered proof is a factor in determining if a waiver was voluntary.

For example, Person argues that at the time of interrogation his mental capacity was extremely diminished as a result of methamphetamine intoxication. Person asserts that he had been using methamphetamine heavily for several weeks prior to the interrogation, and produced testimony at the suppression hearing from a witness who indicated he had seen Person just hours prior to his arrest, and that Person's eyes at that time "were dark and sunken, and he was talking just a bunch of gibberish and mumbling." Person also points out that at one point during the interrogation he seemed to agree with the suggestion that he was currently "tweaking," or high on methamphetamine. Later in the interview, however, Person asserted that he was not "tweaking." The district court found that Person was articulate, coherent, and clean and shaven at the time of his questioning. This assessment is borne out by the videotapes made of the interrogation.

The first two factors, whether *Miranda* warnings were given and the youth of the accused, do not weigh in Person's favor. Furthermore, there is no evidence that Person lacks a rudimentary formal education or that he is of an abnormally low intelligence. However, Person asserts that the factual circumstances surrounding his interrogation show that the length of the detention and the repeated and prolonged nature of the questioning had a profound psychological effect on him. Person's interrogation lasted approximately three hours, and he contends that during this time he endured a continual barrage of aggressive questioning. Person concedes that a three to four hour detention and interrogation "may not appear particularly significant," but argues that such length is "interminable to an individual who is sleep-deprived and constantly peppered with questions." Again, the district court found, and it is borne out in the videotape, that virtually every time Person indicated he was tired and needed a break, he was given one or the topic was changed to casual conversation.

Person also asserts that he was suffering from extreme exhaustion and sleep deprivation at the time of his interrogation, and argues that the evidence shows he was "barely conscious" at the time of interrogation. However, this assertion is not borne out by our review of the videotapes, which show that Person was alert and articulate throughout the interrogation. Furthermore, Person was given a soft drink while he waited for the interrogation to begin and was thereafter given water upon request. Although Person never indicated he was hungry, he was given a slice of pizza after the interview. The record does not establish that the officers deprived Person of either food or sleep.

For the reasons listed above, we conclude that the district court's finding that Person was capable of voluntarily, knowingly, and intelligently waiving his *Miranda* rights was supported by substantial and competent evidence.

## 2. Miranda Violations

Person also asserts that the district court erred when it held that the police had not violated his *Miranda* rights to counsel during the interrogation because on several occasions he invoked his right to counsel. When an individual in custody invokes his right to an attorney, all questioning must cease, and further interrogation may not take place until counsel has been made available or the accused re-initiates further discussion. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 385–86 (1981); *State v. Cheatham*, 134 Idaho 565, 574, 6 P.3d 815, 824 (2000). Further interrogation is allowed only when it is shown by a preponderance of the evidence that the accused initiated further discussions and knowingly and intelligently waived the right to counsel he had earlier invoked. *Cheatham*, 134 Idaho at 574–75, 6 P.3d at 824, 825 (citing *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 494–95, 83 L.Ed.2d 488, 493 (1984)). An individual's right to cut off questioning pursuant to *Miranda* must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d

313, 321 (1975); *State v. Law*, 136 Idaho 721, 724, 39 P.3d 661, 664 (Ct.App.2002). Measurement of whether the accused's right to cut off questioning was scrupulously honored requires evaluation of what the police did, and when, after that right was invoked. *See* WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 6.9(f) (2d ed.1999).

Person first requested an attorney approximately four and one-half minutes into the interrogation. His colloquy with the detectives, transcribed verbatim from videotape, was included in the district court's findings. Person stated, "I'm going to say ... this is where I'm gonna have to have my lawyer present." The police terminated the interrogation and left the room. A short time later, one of the detectives returned and read Person the warrant for his arrest, which informed Person that he was suspected of murdering Christensen. The following exchange then took place:

Person: Right, well I was correct in ... correct in my thinking um, as far as four days.

Detective: Pardon?

Person: As far as uh, when you asked me about uh, four days ago and you know, Friday, so ... and I knew ... and that's why I'm talking to everybody today so ... and no, I didn't murder ... no I didn't murder anybody....

Detective: If you want to tell us something ... now is the time to do it.

Person: I know some s— okay? Do I need a lawyer, I mean, tell me the truth please, cause I'm f—ing scared as hell.

Detective: I can't answer that for you.

Person: I know you can't, but do I need my lawyer? Or I mean ... cause to me it doesn't really matter because I'm going to repeat it the same way, I mean, unless I tell you now or I'm going to say it the same way it happened when she's here too. I can tell you ... I can tell you....

Detective: I can't answer that for you.

Person: I mean ... uh, yeah I mean, that's fine. Yeah I will talk to you guys now okay? Um, I mean, I know what we're talking about alright?

Detective: What did you think we were talking about?

Person: Well you never know, I mean I don't know. If ... f— I've been involved in all kinds of circles, you know? There's cruel s— going on all over the place and I know they're f—ing stealing a pair of tennis shoes at the, you know, the shoe store across the street. Is it that crime or is it this one? F—.

Detective: Well we're not talking about stealing tennis shoes.

Person: Exactly. We're talking about a f—ing murder of a young kid that's f—ed okay? And if you guys want to come back in and sit down I'll tell you everything I know about it.

Detective: Cause I'll tell you what, I'm not going to come back in here and sit down....

Person: I'll tell you every f—ing detail, everything I know. No, no, do you understand what I'm ... what my position ... that you guys come in and say, "We want to talk to me, you don't tell me ... just tell me about uh, you know, What did you do a year ago?" Well, you know I mean I can ... it's part of ... I don't know ... if I was being a criminal that day and committed, I don't know, umpteen things ... you know what I'm say ... do you understand what I'm saying?

Detective: What do you want to talk....

Person: I will talk to you about absolutely the murder of Eric Christensen. Yes, I will.

Detective: You told us before that you would not talk to us now ... so I want to make sure that you want to talk to us.

Person: No, yes, I'm totally a hundred percent sure that I will talk to you about Eric Christensen because I do know what you are talking about now.

The question presented is whether by re-entering the room, reading the arrest warrant, and telling Person that now is the time to talk, the detective effectively re-initiated the interrogation and violated Person's *Miranda* rights, thereby failing to scrupulously honor Person's invocation of those rights. An interrogation includes not only express

questioning but also its "functional equivalent." *Salato*, 137 Idaho at 267, 47 P.3d at 770 (citing *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307 (1980)). The United States Supreme Court has explained the distinction between an express questioning and its functional equivalent as follows:

> ... the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable result of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that *they should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 300–02, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 307–08; *see also State v. Frank*, 133 Idaho 364, 370, 986 P.2d 1030, 1036 (Ct.App.1999).

The district court held that the police had not re-initiated interrogation but had appropriately contacted Person to inform him of the charge that he faced. Idaho law requires that, at or near the time of an arrest, the accused be advised of the arrest, the reason for it, and the authority to make it. I.C. §§ 19–608, –609; I.C.R. 4. None of the officers who had been present at the actual arrest and testified at the suppression hearing could recall whether Person had been advised of the charges at that time. The district court concluded, because of the seriousness of the crime and this uncertainty about whether the warrant had been read at the time of arrest, that the reading of the warrant was a circumstance "ordinarily attendant" to the arrest and detention. Accordingly, the district court concluded that the reading of the warrant could not be considered the type of statement intended to elicit an incriminating response. This reasoning is sound.

In *Salato*, 137 Idaho 260, 47 P.3d 763, we explained our objective test for determining whether a given interaction rose to the level of the functional equivalent to an interrogation. The defendant in *Salato* was one of three men taken into custody by police on suspicion of robbery. After initially waiving his right to counsel, Salato later invoked that right and his interview was terminated. One of the detectives, while periodically checking in on Salato, told him he would be taken to jail as soon as the other suspects had finished writing up their confessions. Although a truthful statement, on appeal Salato argued that this announcement was reasonably likely to elicit an incriminating response and was the functional equivalent of interrogation. Relying in part on *Innis*, 446 U.S. at 302–03, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308–09 where the United States Supreme Court held that two officers' dialogue in the presence of the defendant regarding the possibility that a handicapped child would find the gun the defendant had used in committing a murder and a robbery did not constitute interrogation, in *Salato* we held that the detective's statement did not objectively call for nor solicit an incriminating response. *Salato*, 137 Idaho at 268, 47 P.3d at 771. We further noted that while the statement may have "struck a responsive chord" in the defendant, such did not rise to the level of a functional equivalent of an interrogation. *Id.* We conclude this distinction is controlling in the instant matter as well. As in *Salato*, the detective in the instant matter was not being deceptive,[2] and although the reading of the

---

**2.** By this statement, the Court notes that not all police deception is prohibited. *See State v. Schu-* *macher,* 136 Idaho 509, 37 P.3d 6 (Ct.App.2001).

arrest warrant clearly struck a responsive chord in Person, that reading was well within the parameters of a statement normally attendant to arrest and custody under *Innis* and *Salato*. The reading of the arrest warrant in this case was not objectively likely to elicit an incriminating response.

■ However, as the interrogation entered its final hour Person again made a clear and unequivocal request for counsel.

> Person: Kinda, you guys ... this is where I want my lawyer.
>
> Detective: Okay.
>
> Person: Okay, this is where I would want my attorney involved.
>
> Detective: Okay uh....
>
> Person: Cause there's ... cause you know the rules, I know. There's a little bit of a flaw in my story okay? And I'm gonna admit to that right this minute alright? But, and there's reasons behind that, I mean I just don't want, I don't know man ... I didn't f——ing kill Eric and Joi, Joi's using my knife, it's my f——ing knife alright? And she's, she slits his throat. Okay and yeah there were Mexicans, they drove up there....
>
> Detective: Hold on now.
>
> Person: F——, I'm scared guys okay? Scared as f—— cause I was standing right there when f——ing Eric got f——ing killed. Yeah I'm f——ing scared s—— and I just don't know I mean, I don't know how I entered the f——ing position watching a kid get killed you know, I mean f——. I just went from f——ing wanting a place to f——ing live, to have roof over my head for a temporary to being forced to cooking dope to a kid getting killed. F——, you know, and it's over what? Nothing. Stupid s——. He doesn't deserve ... to get ... she told Joi to take care of it, "Mark go with her." She says, and she ... I've seen the strength of f——ing Carla, the wrath of Carla, man, she truly has got some power and she will have you dead if she wants you dead.
>
> Detective: Okay you told us uh....
>
> Person: Okay.

> Detective: ... you told us you want to talk to your attorney?
>
> Person: I do.
>
> Detective: No, this is a decision you have to make.
>
> Person: Yeah.
>
> Detective: You have to make this decision, and you absolutely want, you want to talk to your attorney?

Person thereafter continued to make incriminating statements.

The state asserts that Person delivered a virtual torrent of incriminating statements after declaring he needed his attorney, and contends that "the officers did not even have the opportunity to make a meaningful interjection into Person's stream of confession." After reviewing the videotapes that document the entirety of the interrogation at issue, we conclude that the state's depiction of these events is inaccurate in this regard. At one point one of the detectives queried Person "... you told us you want to talk to your attorney?"—to which Person replied "I do." Instead of then terminating the interrogation, the detective meaningfully interjected "No, this is a decision you have to make." The detective thus pretended that some clarification or further "decision" from Person was needed even after Person had clearly and unequivocally invoked his right to counsel. Furthermore, after another of Person's attempts to invoke his right to counsel, the detectives hesitated until Person began to speak again. After another moment during which Person further incriminated himself, he paused and looked down at which point the detective positioned at the left corner of the screen, at Person's right, signaled the other person in the room to not interrupt Person—making a "shushing" motion by raising his index finger to his lips.

The detectives did not scrupulously honor Person's request for counsel, instead requesting multiple confirmations of Person's intent to cease the interview and consult his attorney. The district court's determination that Person waived his right to counsel shortly after he had invoked that right is not supported by the evidence. All of Person's statements made after his invocation of the right to counsel at two hours, forty-six min-

utes, and two seconds approximately comprising the final hour of Person's time in the interrogation room, should therefore have been suppressed. Person's statements before this point in time are not suppressed.

## IV.

### CONCLUSION

We conclude that the district court's finding that Person was capable of voluntarily, knowingly, and intelligently waiving his rights at the outset of the interrogation is supported by substantial and competent evidence. However, because the police did not scrupulously honor Person's later invocation of his right to counsel, occurring at two hours, forty-six minutes, and two seconds into the interrogation, we conclude his statements made subsequent to this time should have been suppressed. Accordingly, we reverse the district court's decision to deny Person's motion to suppress and remand for further proceedings consistent with this opinion.

Chief Judge LANSING and Judge Pro Tem WOOD concur.

